THE ESTATE OF SWANNIE HER, et al.,
          **Plaintiffs,**
    v.
CRAIG SADNOWNIKOW, et al.,
          **Defendants.**

Case No: 17-CV-1015

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NOW COME the Plaintiffs by their attorneys, **JUDGE, LANG & KATERS, LLC** and **GENDE LAW OFFICE, S.C.**, and submit their Opposition to the Defendants' Motion for Summary Judgment, stating as follows:

### I.      INTRODUCTION

The Regner Park pond is a man-made aquatic attraction that is always murky ("the Murky pond") with a mud bottom, visibility beneath the surface less than 6 inches, and lifeguards could not see more than a foot in front of their faces while swimming. *See* Plaintiffs' Proposed Findings of Fact in Response to Defendants' Motion for Summary Judgment ("PPFOF"), ¶¶ 1,2. The pond is divided into a children's play area, a diving raft area, and a general area; for lifeguarding responsibilities, the general area is Zone 1; the diving raft area is Zone 2; the children's play area is Zone 3. (PPFOF ¶ 3.)

On June 11, 2016, there were approximately 800 paid patrons at Regner Park and there were around 200 patrons in the Murky pond when Swannie Her ("Swannie") drowned. (PPFOF ¶ 7.) There was an area in Zone 2 of the pond, where a child earlier on June 11, 2016, went under the water surface within seconds because of a hidden drop-off. (PPFOF ¶ 8.)

The West Bend Aquatic Manual & Emergency Response Plan provides that: "As a professional lifeguard, your primary responsibility is to protect the life and wellbeing of each person

using Regner Park Beach." (PPFOF ¶ 12.) The Lifeguarding Duties and Principles for lifeguards at Regner Beach require lifeguards:

   a. Be attentive at all times! Focus on and promote accident prevention!
   b. Enforce all beach rules.
   c. Observe and monitor the extremes – the highly active and over confident swimmer, and the highly passive and unskilled swimmer, as well as the high risk patrons, such as the elderly, intoxicated, obese and swimmers with small children. **It can't be emphasized enough to watch small children**. Parents can neglect their children.

(PPFOF ¶ 13) (emphasis added). Watching small children was a mandatory requirement for all lifeguards at the Murky pond. (PPFOF ¶ 14.)

Lifeguards were required to enforce the rules: 1) that all swimmers wear wristbands and 2) that an adult must accompany children under the age of five at all times and must be within arm's reach. Those two rules were in place to ensure the safety of children. (PPFOF ¶ 17.) If a child is in the water and is five years or younger with no adult within arm's length, the lifeguards must have the child removed from the water. There is no discretion. (PPFOF ¶ 18.) If a child in the water without parental supervision looked small, and a lifeguard was unsure of their age, they were required to radio someone in the beach house to address the issue so the child would be safe. (PPFOF ¶ 19.)

"WATCH SMALL CHILDREN!!!" is heavily emphasized in the policies and procedures because they are high risk swimmers, "Mostly because parents don't pay attention enough." (PPFOF ¶ 21.) If a small child is in water up to their waist, a lifeguard is required to intervene with the child and then find the parent because the child could go underwater fast. (PPFOF ¶ 22.) If a lifeguard monitoring one zone of the Murky pond sees a small child going into the water in a different zone without an adult, that lifeguard is required to act and have the child removed from the pond. (PPFOF ¶ 24.)

It is mandatory for lifeguards at the Murky pond to know and constantly scan their zones within seconds. If a lifeguard cannot comfortably scan their zone within seconds, then more staff is

2

required, and a supervisor must be notified. (PPFOF ¶ 25.) These lifeguards were not properly trained on how to scan the water. (PPFOF ¶ 47.)

No swimmer was allowed in water over their arm pits without a swim test wristband. The swim test wristband was only issued to patrons who passed a mandatory swim test. It was a different color and put on the opposite wrist of the entrance wristband to clearly distinguish which patrons were allowed in water above their arm pits. (PPFOF ¶ 26.) The lifeguards referred to Zone 2 as the "deep well," which is the part of the Murky pond that no one could enter without passing a swim test. (PPFOF ¶ 41.)

On June 11, 2016, Swannie arrived at the park just after 5:00p.m., put on her swimsuit and her mother, Connie Her, gave Swannie permission to go into the water with her siblings. (PPFOF ¶ 53.) The Her children, Thavon (age 14), Jasmine (age 10), Evangelin (age 9), Ekin (12) and Swannie went to the beach together without adults. (PPFOF ¶ 54.) Even though Swannie had been in and out of the water for approximately 40 minutes, and the lifeguards were responsible for scanning their zones every 8-10 seconds, no lifeguard saw Swannie before she drown. (PPFOF ¶ 68.)

Swannie's lifeless body was found a few feet from the most dangerous area of the Murky pond, the "deep well" area of Zone 2 at approximately 5:55 PM by an adult male patron in water up to his chest. PPFOF ¶¶ 62,64. Swannie was on the bottom of the pond for approximately ten minutes before she was found. (PPFOF ¶63.) No lifeguard swim tested Swannie, she did not have the swim test wristband and should not have been allowed access to Zone 2. If Swannie was seen in Zone 2 she should have been removed by lifeguards. (PPFOF ¶ 61.)

Ten minutes before Swannie drown at the bottom of the Murky pond, Abigail Ehmke was assigned to the swim raft lifeguard position and was responsible for watching the beaches on the north and south sides of Zone 2. (PPFOF ¶¶ 69,71.) Abigail Ehmke stated that she felt overwhelmed with the amount of people in the water and that when she was lifeguarding on the raft

3

she should have asked for another lifeguard on the raft "because there were a lot of people on and around the raft. (PPFOF ¶ 70.) If Abigail Ehmke had seen Swannie in water up to her waist coming without a parent within arm's reach, she would have removed Swannie from the water. (PPFOF ¶ 72.)

The West Bend Police Department conducted a criminal investigation into Swannie's death. (PPFOF ¶ 79.) Chief Meuler emailed Craig Hoeppner, the West Bend Director of Parks, Recreation and Forestry, that an internal investigation of the lifeguards' actions can be conducted on whether policies and procedures were followed and the Chief offered one of his investigators to assist. (PPFOF ¶¶ 80, 32.) The Emergency Action Plan required that "immediately following an occurrence, incident reports are to be completed." (PPFOF ¶ 81.) No incident reports were done, and despite the Chief's direction and offer to assist, Hoeppner chose not to conduct any internal investigation on whether his lifeguards followed policies and procedures. (PPFOF ¶ 82.) Hoeppner did not have any conversations with the lifeguards if policies were followed. (PPFOF ¶ 83.) Hoeppner did not know whether Swannie was a small child, or whether she was three feet tall or six feet tall. (PPFOF ¶ 84.)

A debriefing of the lifeguards took place the day after Swannie died, yet nothing was discussed about how she was able to enter the Murky pond sight unseen by any lifeguard or how she was ultimately found by a patron at the bottom. (PPFOF ¶ 86.) Mykalene Bordeau was responsible for supervising the lifeguards on June 11, 2016 but she never had a discussion with lifeguards about how Swannie, a small child without a swim test bracelet or adult within arm's length, drown. (PPFOF ¶¶ 87-89.) Ms. Bordeau never asked any of the lifeguards if they had followed the rules, policies or procedures and never discussed Swannie's drowning with her supervisor Craig Hoeppner. (PPFOF ¶ 90.)

4

For additional facts, plaintiffs respectfully refer this Court to Plaintiffs' Proposed Findings of Fact in Response to the Defendants' Motion for Summary Judgment ("PPFOF") and Plaintiff's Responses to the Defendants' Proposed Findings of Fact ("DPFOF") filed herewith and incorporated herein by reference.

## II.        STANDARD OF REVIEW

Summary judgment is only proper, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The court's role when deciding a motion for summary judgment is not to evaluate evidence or determine the truth of the matter at issue, but only to determine whether there is a genuine issue of fact. *Moore v. Ford Motor Co.*, 901 F.Supp. 1293, 1296 (N.D.Ill. 1995).

When considering summary judgment, evidence presented by the opposing party supported by affidavits or other evidentiary material is to be taken as true. *Askaw v. Blemker*, 548 F.2d 673, 680 (7th Cir. 1976). Further, all justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the factfinder could reasonably find in the nonmovant's favor, then summary judgment is improper. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1968). As set forth below and exhaustively detailed in PPFOF, as well as Plaintiffs' responses to the DPFOF, there is overwhelming evidence from which a reasonable juror could conclude that the Defendants violated Plaintiffs' 14th Amendment rights.

## III.        ARGUMENT

### A. THE INDIVIDUAL DEFENDANTS ARE LIABLE UNDER THE STATE-CREATED DANGER DOCTRINE.

"It is clearly established that state actors who, without justification, increase a person's risk of harm violate the Constitution... State actors who needlessly create risks of harm violate the due process clause by depriving persons of life, liberty, or property without process..." *Paine v. Cason*,

5

678 F.3d 500, 510 (7th Cir. 2010). This is often called the "state created danger" doctrine. To hold a state actor responsible under the state-created danger, a Plaintiff must show that: a) a state actor created or increased a danger faced by an individual, *Id.*; b) the state actors were aware of the risk and consciously failed to take reasonable measures to prevent harm to Plaintiff, *Reed v. Gardner*, 986 F.2d 1122, 1127; and c) this was the cause of the Plaintiff's injuries, Id.

### 1. The City of West Bend Created the Regner Park Pond and the Individual Defendants Needlessly Increased the Risk of Danger to Swannie Her.

The state-created danger doctrine was adopted over 35 years ago in the Seventh Circuit. In *Bowers v. DeVito*, 686 F.2d 616, 619 (7th Cir. 1982), Judge Posner held that the government could be held liable if it created the danger that caused the injuries to a Plaintiff: "If the state puts a man in a position of danger . . . and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." Id. Shortly after *Bowers* was published, the United States Supreme Court adopted the state-created danger doctrine in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989). Here, West Bend cannot argue that the murky pond was anything other than a state created danger with almost zero visibility below the surface of the water and an unknown, unseeable topography across the bottom – including a hidden drop-off in an area open to children. (PPFOF, ¶ 2, 8.) In fact, due to the known dangers of the Murky pond, West Bend created a list of mandatory policies, procedures and rules in an attempt to protect small children from swimming unaccompanied by an adult or before first being swim tested and receiving a recognizable wrist band upon successful completion. (Id. ¶ 17.) West Bend emphasized to its lifeguards to **"WATCH SMALL CHILDREN!!!"** (emphasis added in the original), and to constantly survey the surface of the Murky pond to locate small children outside arm's reach of an adult or above their armpits without the requisite swim test wristband. (Id. ¶ 21.)

6

Even prior to *Bowers*, state actors were on notice that if they created a hazardous situation for a person and simply left the person unprotected, they could be liable under § 1983. In *White v. Rochford*, 592 F.2d 381, 384 (7th Cir. 1979), the court ruled that police officers who "left helpless minor children subject to inclement weather and great physical danger without any apparent justification" were liable for violating those children's constitutional rights under § 1983. The court reasoned that the police officers could not avoid knowing that, absent their assistance, the three children would be subjected to exposure to cold weather and danger from traffic. Id. The children fortunately suffered only minor injuries and emotional distress, but nevertheless the court found that the state had deprived these children of their constitutional right to bodily integrity. Id. at 384-85. Here, in a much more extreme example with fatal consequences, and despite the lifeguards training to the contrary, not a single one identified Swannie, a small child, enter the water above her armpits without the swim test wristband and outside the arms-length of an adult before a patron stepped on Swannie's lifeless body at the bottom of the Murky pond. (PPFOF ¶ 17, 60, 62.)

Courts repeatedly hold state employees responsible under §1983 for placing people, both adults and minors, in dangerous situations and then failing to act to protect them. *See, for e.g., Stoneking v. Bradford Area School Dist.,* 882 F.2d 720, 724-25 (3rd Cir. 1989) (student who was molested by teacher survives summary judgment against school district for its deliberate indifference in its policies that allowed teacher who had previously sexually assaulted students to continue to work for the school district, creating a danger to the students); *Whitted v. Dart*, 2014 U.S. Dist. LEXIS 84678 (N.D. Ill. 2014) (Plaintiff 16-year old arrestee who was raped by inmates after being put in adult jail after telling five deputies his age, survived summary judgment based on state-created danger and the deliberate indifference of the state for the deficient training of its employees); *Billado v. Parry*, 937 F.Supp. 337 (D Vt. 1996) (Plaintiff's §1983 claim survived summary judgment when police created a danger by directing person who assaulted the Plaintiff to the Plaintiff and deputies stood by and

7

watched while man was assaulted). Here, it is undisputed that the Murky pond was inherently dangerous due to the lack of visibility below the surface, requiring constant vigilance by the attending lifeguards, with special emphasis placed on **"WATCH SMALL CHILDREN!!!"** (PPFOF ¶ 2, 21.) Yet, these lifeguards allowed Swannie, a small child, to venture into the Murky pond above her armpits without being seen and die at the bottom of a pond unattended and un-noticed until a patron stepped on her lifeless body. (Id. ¶ 62, 64.)

The state-created danger doctrine has been applied to aquatic environments. In *Bradbury v. Pinellas County*, 789 F.2d 1513, 1515 (11th Cir. 1986), an adult man drowned in the ocean, near a lifeguarded area after he tired while swimming. The Court examined liability under §1983 and the state-created danger doctrine but found the circumstances too attenuated, "The state did not kill Kenny Ray Thomas, the ocean did." *Bradberry v. Pinellas Cty.*, 789 F.2d 1513, 1515 (11th Cir. 1986). The lifeguards identified the struggling adult and attempted to render assistance, but failed to do so before the man drown. Id. at 1517. The County did not create the dangerous situation because it had no responsibility for creating the ocean. Id. at 1515. The Court further found that supplying lifeguards on a beach to supervise ocean swimmers did not increase the danger to the adult victim and the lifeguards actually identified the struggling swimmer but were unable to prevent the drowning. Id. at 1517-1518. Unlike the present case, the County did not create rules that influenced a minor's caretaker to let their guard down, creating a false sense of security that the lifeguards would constantly scan for unattended small children in a Murky pond with little to no visibility. Here, it is undisputed West Bend created the dangerous Murky pond, trained lifeguards to especially watch small children, required swim testing before anyone could go in water over their armpits and were required to keep constant vigilance for small children in the water outside of an adult's reach. (PPFOF ¶ 2, 17.) West Bend failed in every regard and its lifeguards never saw Swannie until she was being carried to shore by a patron who stepped on her. (Id. ¶ 62.)

8

Swannie's case is more closely akin to *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979). She is a small child left to navigate the Murky pond in a potentially life-threatening situation that lifeguards were specifically trained to identify and prevent. West Bend's own expert admitted that the Murky pond was a state created danger: "Swimming may be an inherently dangerous activity. The risk of drowning is ever present and is considered to be an open and obvious danger inherent in all water-based recreational activities, <u>especially at a facility where you can obviously tell that you cannot see below the surface of the water</u>. " (PPFOF ¶ 94) (Emphasis added.) The Murky pond was already dangerous due to lack of visibility, but West Bend further increased the danger by: failing to dredge the muck from the bottom creating essentially zero visibility; leaving the bottom uneven, with unexpected drop-offs including a one in an area open to small children; encouraging small children to enter the Murky pond in a designated area that allowed accessed to the 'deep well'; not separating the children's area from the deeper areas; not putting buoys in areas that marked off depth changes where children could not safely stand in or be seen if they go under; and not creating a formal entrance where persons were informed of the safety rules, but instead leaving the responsibility of announcing rules to teenage lifeguards only after a violation occurs. (<u>Id</u>. ¶ 2, 4, 5, 8, 43.) It is clear under the state-created danger doctrine that West Bend's Murky pond was dangerous for small children like Swannie and it utterly failed its constitutional duty to protect Swannie's right to life, liberty and the pursuit of happiness under these circumstances.

Swannie was in/out of the Murky pond from approximately 5:00 PM to 5:45 PM. Ryan Zamzow was the head lifeguard, and Abigail Ehmke, Brogan Zochert, Madeline Kaphingst and Michaela Millard (the "On-Duty Lifeguards") were responsible for constantly scanning the pond to ensure patron safety by enforcing the policies, procedures and rules. (<u>Id</u>. ¶ 52, 63-64, 67.) Rather than ensuring her safety, the On-Duty Lifeguards increased the risk of harm to Swannie on the date in question.

First, the fact that lifeguards were posted suggested to parents that West Bend was providing an aura of safety to small children entering the Murky pond and gave Swannie's mother the false impression that the lifeguards would be watching out for Swannie while in the Murky pond. (RDPFOF ¶ 11.) And rightly so, because West Bend's policies required the lifeguards to do exactly that – **"WATCH SMALL CHILDREN!!!"** (emphasis added in original), and ensure that all unaccompanied small children in water up to their waist were removed from the pond. (PPFOF ¶ 21, 22.) As part of the duty to watch small children, the On-Duty Lifeguards were required to ensure that any child five years or younger be within arms-length of an adult while in the Murky pond. (<u>Id.</u> ¶ 18, 20.) If the On-Duty Lifeguard had any doubt about the child's age, they had the duty to err on the side of caution and remove the child from the water. (<u>Id.</u> ¶ 19.)

Second, the lifeguards were responsible for announcing pool rules, yet Swannie's mother was never advised of the most important rules for Swannie's safety. (RDPFOF ¶ 20.) No announcements were made about keeping children within arm's reach or swim testing. (Id. ¶ 11.) Seeing posted lifeguards, Connie believed the On-Duty Lifeguards were there to safeguard Swannie. (<u>Id.</u>) When the lifeguards utterly failed in every regard to implement a single, policy or procedure in place to protect a small child like Swannie, this needlessly increased the danger and was a cause of her untimely death.

The On-Duty Lifeguards had the mandatory duty to enforce rules and follow policy/procedure, but failed to do anything to intervene or prevent Swannies' death. Nobody told Swannie or her mother that when Swannie entered the Murky pond it was at her own peril or that the lifeguards paid to protect Swannie's life would ignore their every responsibility in that regard. (RDPFOF ¶ 20.) These mandatory rules included the duty to **"WATCH SMALL CHILDREN!!!"** (emphasis added in original), and "It can't be emphasized enough to watch small children. At times, parents can neglect their children…". (PPFOF ¶ 13, 21.)

10

These duties could only be enforced by lifeguards if they effectively scanned their zones every eight to ten seconds. (Id. ¶ 68.) Yet none of these lifeguards saw Swannie before she sunk below the surface and died. (Id. 63, 64, 68.) Despite the lifeguards' duty to scan their zones hundreds of times while Swannie was in the water, each and every one failed to observe Swannie. This is the environment that West Bend and their lifeguards created and invited Swannie to participate in. West Bend and the On-Duty Lifeguards created a dangerous situation and rendered Swannie more vulnerable to danger. Therefore, the state-created danger doctrine applies.

### 2. The defendants knew of the inherently dangerous environment, especially for children but failed to take any precautions to prevent Swannie's death.

The individual Defendants argue no liability unless their actions "shock the conscience". (D. 37, p. 8.) This is not true at summary judgment. In *Reed v. Gardner*, 986 F.2d 1122, 1127 (7th Cir. 1993), the court held that once it is established a state actor has created a danger for an individual, it then has a duty to "take reasonable preventative steps to diffuse that danger." Based upon the jury instructions published by the Seventh Circuit, this is the appropriate standard.

Seventh Circuit Jury Instruction 7.21 "Due Process: State-Created Danger" provides two separate standards for the necessary intent to hold a state actor liable under the state-created danger doctrine. The primary intent standard is that the "Defendant was aware of the risk and consciously failed to take reasonable measures to prevent harm to Plaintiff," based on *Reed*. The comments then provide "[i]n a case in which a 'hurried judgment' is involved, the second alternative under element 3 should be used. There may be cases in which the amount of time that the defendant had to reflect on the act is a disputed question for the jury. In this situation, the jury should be given an intent instruction that poses this threshold issue and gives both intent alternatives, with the correct choice depending on the jury's resolution of the threshold issue." J.I. 7.21, Comment f.

The Plaintiffs do not assert any individual defendant acted improperly in the face of an emergency, nor do the defendants seriously argue such. The Plaintiffs do not assert that any

11

lifeguard saw Swannie drowning and took too long to get to her, that CPR was administered improperly, or that any lifeguard was aware of an emergency situation that triggered a duty to act. On the contrary, it is the combined failures of every On-Duty Lifeguard to do anything whatsoever to protect Swannie on the date in question, while equally failing to recognize her emergent situation on the bottom of the Murky pond that necessitates liability. These failures to act are far more egregious then a recognition of an emergent situation with an untimely response.

Actionable offenses consistent with the case law arise through the course of discharging their normal duties, each of the On-Duty Lifeguards consciously failed to take reasonable steps to prevent harm to Swannie, despite knowing based on their training that small children like her were especially vulnerable to the inherent dangers in the Murky pond.  These lifeguards had mandatory duties to constantly survey the aquatic environment, with a repeated emphasis on watching small children, to enforce the swim test and ensure that small children remained within arm's length of an adult at all times - yet not a single defendant can cite a single fact that supports an inference they performed one of these duties in relation to Swannie's death.  (PPFOF ¶ 20, 21, 22, 23, 24.) Swannie was in and out of the water for approximately 40 minutes before she drowned. (Id. 52, 63, 64.)  There is no excuse for the lifeguards' combined egregious, fatal errors resulting in this small child's death.

Training required that if lifeguards cannot scan their entire zone comfortably or feel overwhelmed, then they must ask for assistance.  (Id. ¶ 25.)  Abigail Ehmke, the lifeguard on the raft watching Zone 2 during part of the time Swannie was in the Murky pond, and likely when Swannie went under, admitted she was overwhelmed and could not scan her entire zone because of the number of patrons in and around the raft.  (Id. ¶ 70.)  Yet she failed to ask for help.

The head lifeguard Ryan Zamzow, knowing that there were approximately 200 swimmers in the pond and only three lifeguards, hung out in the beach house with other lifeguards on break.  (Id.

¶ 78.) He did not leave the beach house until advised two drunk patrons refused to take the mandatory swim-test. (Id.) Zamzow left the beach house and watched Ehmke struggle to gain compliance with the drunk patrons. (Id.) Zamzow expressed no concern for Swannie's plight or any of the other patrons who were at risk of drowning without being seen because lifeguards were overwhelmed. Instead, and inexplicably, he testified that he was not on a lifeguard stand when she drowned, so he did not know what happened or whether the lifeguards he supervised were following the mandatory rules. (Id. at 93.) He did not even know where Swannie was found until after the lawsuit was filed. (Id. at 93.)

Under the controlling summary judgment standard, it must be shown that the individual lifeguards were aware of the risk to Swannie, and they failed to take reasonable steps to prevent her foreseeable harm. First, On-Duty Lifeguards were all aware that the aquatic environment at the Murky pond was inherently dangerous. Their own expert admits as much. Second, Abigail Ehmke conceded she was overwhelmed and could not scan her zone properly. (Id. ¶ 70.) This created a specific danger for the patrons of the Murky pond at the time Swannie drown and put small children especially at needless risk. Ehmke admitted the reasonable action would have been simply to have another lifeguard brought out to assist with constantly scanning the water. (Id.) Zamzow could have done so himself or order one of the other lifeguards on break assist in scanning the Murky pond, rather than hanging out in the beach house. (Id. ¶ 78.) None of the on-duty lifeguards can offer any explanation as to how they failed to see Swannie, a small unaccompanied child in water above her armpits without the requisite swim test wristband before she drowned. There is absolutely no excuse for this unnecessary and fatal tragedy. At least the lifeguards in *Bradbury* identified the adult swimmer in distress in the ocean, as opposed to these lifeguards' utter dereliction of duty in relation to Swannie's death.

13

The Defendants don't assert their failure to timely act was related to an emergency – because they would first have to recognize an emergency. Clearly none of them identified any emergency before Swannie was lifeless on the bottom of the Murky pond. Regardless, failing to take any action, let alone reasonable action, for 40 minutes cannot be construed as a reaction to an "emergency." The question on summary judgment is whether the On-Duty Lifeguards were aware of the risk to an unaccompanied and non-swim-tested small children and consciously failed to take reasonable measures to protect the health, safety and welfare of Swannie while she participated in a state-created danger. The answer, when considered in conjunction with all reasonable inferences to be afforded the non-moving party, is clearly "yes." Either the On-Duty Lifeguards could not adequately scan their zones, as Ehmke admitted, which should have resulted in more lifeguards being called to assist. Or, alternatively, they saw Swannie, a small child without a swim test wristband outside an adult's reach and ignored the inherent danger to that child despite their training to the contrary.

### 3. The state-created danger was the proximate cause of Swannie's death.

In a cruel twist heretofore unrecognized by the law, the lifeguards seek absolution for their constitutional violations by blaming Swannie's mother for negligent supervision. There has never been comparative negligence applied to a state actor's constitutional violations under §1983. *Clappier v. Flynn*, 605 F.2d 519, 530 (10th Cir. 1979.) "Contributory negligence has never been a defense to intentional tortious conduct," such as a federal civil rights claim. *Hays v. Jefferson Cty.*, 668 F.2d 869, 875 (6th Cir. 1982).

The Court must determine whether the On-Duty Lifeguards' failure to take reasonable steps to protect Swannie's life was a cause of her death while providing all reasonable inferences to the non-moving party. If the On-Duty Lifeguards saw Swannie, they were required to act and failed. If the On-Duty lifeguards failed to see Swannie, then they violated every aspect of their training to

14

constantly surveil and pay special attention to small children in the Murky pond. Ultimately, all that must be determined on summary judgment was whether such action or inaction was causal to preclude judgment as a matter of law.

None of the On-Duty Lifeguards enforced any of the rules that they were required to follow to ensure Swannie's safety. (PPFOF ¶ 61.) None of the On-Duty Lifeguards determined whether Swannie ventured into the Murky pond outside an adult's reach. None of the On-Duty Lifeguards identified Swannie swimming without first passing a swim test. None of the On-Duty Lifeguards saw Swannie venture into Zone 2 with its hidden dangers. Instead, Swannie was found by a male adult patron walking through chest deep water near the hidden drop-off in the Murky pond, when he stepped on Swannie and then carried the lifeless body of this young child to shore. (Id. ¶ 62.) If the On-Duty Lifeguards had seen Swannie enforced any of the mandatory rules related to small children, or called more lifeguards to scan the Murky pond, this death was preventable.

### B. WEST BEND FAILED TO TRAIN EMPLOYEES ADEQUATELY IN LIGHT OF AN OBVIOUS DANGER.

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court allowed governmental entities to be held liable under § 1983. *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011); *City of Okla. City v. Tuttle*, 471 U.S. 808, 810 (1985). One of the ways municipal liability can attach is through a constitutional violation brought about by a widespread, though unwritten, custom or practice. *Darchak v. City of Chicago Board of Education*, 580 F.3d 622, 629 (2009).

When Defendants consciously ignore a need for action, it can be said that they adopted a *de facto* policy of violating a person's constitutional rights. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, (1989); *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). A conscious ignoring of a need for action can arise from a failure to provide adequate training in light of an obvious danger of constitutional violations in the absence of training. *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029-30 (7th Cir. 2006). This liability can attach even in instances where no previous injuries

15

occurred as a result of the indifference of the municipal policy-maker. *Connick v. Thompson*, 563 U.S. 51, 63-64 (2011).

The Court in *City of Canton*, at 390, n. 10, in allowing single-incident *Monell* liability, posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force. The Court stated that given the known frequency with which police attempt to arrest fleeing felons and the "predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the "highly predictable consequence," namely, violations of constitutional rights. *Id.* The *City of Canton* Court sought not to foreclose the possibility that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations. *Connick v. Thompson*, 563 U.S. 51, 63-64, (2011).

Here, Craig Hoeppner was the Director of Parks, Recreation and Forestry. (PPFOF ¶ 32.) He hired Ms. Bordeau as the recreational supervisor. (Id. ¶ 28.) She was responsible for training the lifeguards, but had prior experience as a lifeguard. (Id. ¶¶ 29.31.) She could not remember any differences in how she trained the lifeguards between a pool setting and open water setting like the Murky pond. (Id. ¶ 35-36.) She did not know any hazards specific to the Murky pond while training the lifeguards. (Id. ¶ 39.) She did not train the lifeguards on scanning the water or the significance of accident prevention, instead she focused on how to respond to an emergency that already occurred. (Id. ¶¶ 46. 47.)

Inviting the public, especially children, to the Murky pond created an obvious danger in the absence of proper lifeguard training. In a Park that regularly had hundreds of patrons, it is obvious on this factual pattern that West Bend inadequately trained these young lifeguards for their

16

obligations in relation to a small child like Swannie, which constituted a violation of §1983. Under these facts, the question of *Monell* liability is one for the jury to decide.

### C. QUALIFIED IMMUNITY DOES NOT APPLY TO SWANNIE'S CIVIL RIGHTS CLAIMS.

Qualified immunity is a judicially-created doctrine that generally shields government officials from civil liability arising from their performance of discretionary functions, only to the extent that their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Biddle v. Martin*, 992 F.2d 673, 675 (7th Cir. 1993). The purpose of qualified immunity is to protect public officials who make "mere mistakes of judgment" that do not rise to the level of a deprivation of a constitutional right. *Butz v. Economou*, 438 U.S. 478, 507 (1978). In order to overcome the affirmative defense, the Plaintiff only needs to show that, when construing the facts in the light most favorable to the Plaintiff, (1) the defendant violated a clearly established constitutional right and (2) the right was clearly established at the time of the alleged violation, such that it would have been clear to a reasonable actor that her conduct was unlawful. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Before analyzing the qualified immunity standard, it must be noted that judicially created protection has no application here, where the On-Duty Lifeguards' duty to ensure the safety of the Murky pond's patrons was mandatory – not discretionary. Qualified immunity applies to discretionary decisions only. *See, for e.g., Danielson v. Chevron Corp.,* 1993 U.S. Dist. LEXIS 17734, at 11 (N.D. Cal. Dec. 6, 1993) (Qualified immunity was not available to defendant in § 1983 case when defendant violated Civil Service Rules, which were mandatory duties); *Brooks v. George County., Miss.*, 84 F.3d 157, 164-165 (5th Cir. 1996) (sheriff not entitled to qualified immunity when he failed to keep and properly transmit pretrial detainee work records, which was a mandatory duty).

Here, every lifeguard had a mandatory duty to continually surveil and scan the water within seconds in an effort to "ensure" the safety of the Park's patrons, which could not have happened

17

based on their combined and admitted failure to identify Swannie for the approximately 40 minutes she was in/out of the Murky pond. (PPFOF ¶ 52, 63, 64.) This failure to surveil and scan is further evidenced by Ehmke's admission that she was overwhelmed and could not scan her entire zone because of the number of patrons in the Murky pond. (Id. ¶ 70.)

All lifeguards had a mandatory duty to pay special attention to small children, because they were high risk patrons, which included an emphasis to **"WATCH SMALL CHILDREN!!!"** and that "**It can't be emphasized enough to watch small children.** At times, parents can neglect their children…" (Id. ¶ 13, 21) (Emphasis in original.) All lifeguards also had a mandatory duty to ensure young children were in arm's length of an adult while in the Murky pond. (Id. ¶ 26.) The lifeguards failed miserably by their own admissions that they <u>never</u> identified Swannie in the Murky pond water before she drown.

All lifeguards had a mandatory duty to focus on "prevention and early intervention." (Id. ¶ 13.) Yet collectively they did nothing to prevent Swannie's tragedy - no prevention or intervention was attempted prior to her drowning. The lifeguards had no discretion whether these mandatory rules were enforced, they had to take these measures to accomplish the stated goal of "ensuring" the safety of the Murky pond's patrons. (Id. ¶ 17.) The lifeguards failed to follow any of their training or enforce a single mandatory rule as it related to Swannie and the "prevention and early intervention" of Swannie's foreseeable drowning death. (Id. ¶ 17.) Qualified immunity does not apply here, because the lifeguards had mandatory duties to act and enforce rules to protect Swannie's life, but they did absolutely nothing.

Even if the doctrine of qualified immunity applies, it does not shield the defendant municipality or the lifeguards from liability, because, at the very least, there are issues of fact as to whether the defendants violated a clearly established constitutional right and it would have been clear to a reasonable actor that the defendants' conduct was unlawful. Courts can, and frequently do,

18

deny qualified immunity claims on summary judgment based on the existence of disputed material facts. *See, e.g., Clash v. Beatty*, 77 F.3d 1045 (7th Cir. 1996)(holding that factual dispute precluded summary judgment on qualified immunity issue); *Johnson v. City of Milwaukee*, 41 F.Supp.2d 917, 929 (E.D. Wis. 1999).

Swannie had a clearly established constitutional right to her life and bodily integrity. There is no dispute that chief among the constitutional rights provided by the Due Process Clause is the right to some degree of bodily integrity. *White v. Rochford*, 592 F.2d 381, 383 (7th Cir. 1979). The Supreme Court has emphatically held that among the most historic liberties so protected was the right to be free from, and to obtain judicial relief for unjustified intrusions on bodily integrity and personal security. *Ingraham v. Wright*, 430 U.S. 651, 673 (1976). Accordingly, the Due Process Clause is implicated where a policeman uses excessive force in the apprehension of a suspect, *Bellows v. Dainack*, 555 F.2d 1105 (2d Cir. 1977); *Stengel v. Belcher*, 522 F.2d 438 (6th Cir. 1975); withholds needed medical assistance from someone in his custody, *Green v. Cauthen*, 379 F. Supp. 361 (D.S.C.1974); *Mullins v. City of River Rouge*, 338 F. Supp. 26 (E.D.Mich.1972); or even when a public school teacher forces a student to cut his hair, *Holsapple v. Woods,* 500 F.2d 49, 51-52 (7th Cir. 1974).

Under the second prong of the qualified immunity exceptions, West Bend and the lifeguards violated Swannie's rights by creating a known danger to Swannie through filling a pond with an uneven, muddy bottom, and doing nothing to protect Swannie after she entered this state-created danger. Instead, the lifeguards stood by, deaf, dumb and mute as this small child drown sight unseen on their watch and under their noses without so much as the sound of a single whistle until her lifeless body was being carried to shore by a patron.

As far back as 1979, state actors have been on notice that they cannot create a dangerous situation for a person and simply leave the person to deal with that hazard. *White, Bowers, DeShaney* and subsequent cases, *supra*, create clear precedent that a municipality that puts a child's bodily

19

integrity, including that child's ultimate right to life, liberty and the pursuit of happiness, at risk through a state-created danger, and then leaves the child without any protection, violates that child's constitutional rights.

It would have been clear to any reasonable state actor, like these guards trained to protect life and ensure the safety of patrons, especially small children like Swannie, that their actions and/or omissions violated Swannie's long established right to the pursuit of life, liberty and happiness while not being subjected to the deprivation of bodily integrity. That is why they are called lifeguards, the guarders of life. Their failure to take reasonable steps to protect Swannie's safety, as outlined above, could clearly result in a constitutional violation.

### D. CLAIMS AGAINST LIFEGUARDS ARE INDIVIDUAL CAPACITY CLAIMS AND NOT REDUNDANT.

Defendants make an unsupported, truncated argument based upon overruled case law that the claims against the individual lifeguards must be dismissed as redundant, arguing such claims are made against the lifeguards in their official capacity. Defendants improperly rely upon *Yeksegian v. Nappi*, 902 F.2d 101, 104 (7th Cir. 1990), which was quickly reversed the next year by the Seventh Circuit and roundly rejected in this District:

> The defendants cite *Yeksigian*…, in which the Seventh Circuit stated that '[i]n the absence of any express statement that the parties are being sued in their individual capacities, an allegation that the defendants were acting under color of law generally is construed as a suit against the defendants in their official capacities only.'… But this holding expressed in *Yeksigian* is no longer the law in the Seventh Circuit. Just one year after deciding *Yeksigian*, the Seventh Circuit held in *Hill*… that "where the complaint alleges the tortious conduct of an individual acting under color of state law, an individual capacity suit plainly lies, even if the plaintiff failed to spell out the defendant's capacity in the complaint."… (explaining this change in Circuit precedent).

*McDermott v. Waukesha Cty.*, 2018 U.S. Dist. LEXIS 90442, at 13 n.5 (E.D. Wis. May 31, 2018)(internalf citations omitted). Under *Hill v. Shelander* and *McDermott*, claims against the lifeguards are in their individual capacity and must be construed as such. The Defendants' argument for summary judgment on the individual claims against the On-Duty Lifeguards is improper.

20

### E. THE CLAIMED IMMUNITY DOES NOT BAR STATE LAW CLAIMS, WHICH SURVIVE SUMMARY JUDGMENT.

#### 1. Recreational immunity does not bar the Plaintiffs' state law claims.

Under the doctrine of recreational immunity, municipalities are provided with some immunity from lawsuits when they open lands that they own to the public for purposes of recreation. However, there are exceptions to this immunity. One exception is that municipalities and their employees are not protected from negligence claims when the death is caused by a malicious failure to warn against an unsafe condition. Section 895.52(4)(b)(2) provides that recreational immunity "does not limit the liability of a governmental body other than this state or any of its agencies or of an officer, employee or agent of such a governmental body for a death caused by a malicious failure to warn against an unsafe condition of which an officer, employee or agent of a governmental body knew, which occurs on property designated by the governmental body for recreational activities."

The issue here is whether West Bend's failure to warn Swannie and her mother of the mandatory rules, the existence of the hidden drop-off, or that the Murky pond was inherently unsafe for small children to swim in without an adult within arm's reach was malicious under the facts of this case. *Ervin v. Kenosha*, 159 Wis.2d 464, 482-484 (1991) defines malice in the context of sub. 895.53(4)(b) to include acts as malicious when they are the result of hatred, ill will, a desire for revenge, or inflicted under circumstances where insult or injury is intended or done with wicked, evil or mischievous motives. Id. at 484. The issue of intent is generally an issue of fact. *Miller v. United States*, 442 F.Supp. 555 (N.D.Ill.1976), *affirmed*, 597 F.2d 614 (7th Cir.1979). For malice to be found, there does not have to be personal hate or ill will. *State v. Cissell*, 127 Wis.2d 205, 211 (1985).

In *Ervin*, the court granted summary judgment in a drowning case, but the facts were undisputed, including that the lifeguard allowed swimmers to drown because she was panicked and confused, not out of any mischievous intent. Id at 471. Ehmke admitted she was overwhelmed by

21

the amount of people in her zone and should have requested additional lifeguards to assist her but failed to act, satisfying the malice threshold established in *Ervin*. (PPFOF ¶ 70.) Additionally, there are facts that West Bend acted with a general malice toward its patrons both in failing to train its employees and during the time that Swannie drowned. West Bend created an inherently dangerous Murky pond, hired Bordeau to train lifeguards on how to watch over the Murky pond when she had no experience, hired inexperienced lifeguards, did not teach lifeguards how to scan the water to keep patrons safe, did not teach lifeguards the different risks associated with pools versus open water, did not warn patrons about the existence of the hidden drop-off which was outside the roped off 'deep well' area, then posted those lifeguards at the Murky pond to create a façade of safety. (Id. ¶ 1, 2, 11, 30, 36, 46, 47.) These are all facts that support a reasonable inference of malice that would overcome recreational immunity.

This case resembles one from the Eighth Circuit involving a similar recreational immunity statute where Plaintiffs survived summary judgment based on factual issues regarding intent. In *Mandel v. United States*, 719 F.2d 963 (8th Cir. 1983) the court denied summary judgment based on the recreational immunity defense when a park ranger told campers the best place to swim but did not warn them of the potential for jagged rocks at the bottom of the swimming hole. A camper dove into the water and was paralyzed. The issue was whether the failure to warn was "willful or malicious". Id. at 967. Based on the two simple facts that the park ranger knew of jagged rocks at the bottom of the river and his failure to give any warnings to the campers, the court found sufficient evidence that the park ranger could have known of the danger and intentionally not told the campers. This was sufficient to preclude summary judgment on the intent issue. Similarly, West Bend and the On-Duty Lifeguards knew of the near zero visibility of the water, the uneven topography on the bottom, the existence of the hidden drop-off, and were trained on paying special attention to small children in the water. (PPFOF ¶ 2, 5, 14.) Yet, each and all failed to warn

22

Swannie or her mother of these inherently dangerous situations at any point and did nothing to ensure Swannie's safety. It is a question of fact whether their failures were willful or malicious.

Evidence of malice can also be found in the failure to investigate, or when an investigation is intentionally faulty. *See Upthegrove Hardware, Inc. v. Pennsylvania Lumbermans Mutual Insurance Co.,* 146 Wis.2d 470, 481 (Ct. App. 1988), (court of appeals upheld a finding of malice against an insurance company when the insurance company's investigator manufactured a basis to deny the Plaintiff's claim). This finding of malice based on failure to investigate starts with Hoeppner, the Director of Parks and Recreation, who did nothing to investigate how Swannie drowned. (PPFOF ¶ 82.) Even though the chief of police recommended an internal investigation to determine whether the lifeguards followed policy/procedures and even offered to assist in investigating any potential failings, Hoeppner ignored the chief's direction and refused to undertake an internal investigation. (Id.) At his deposition, Hoeppner stated he did not know whether Swannie, a little girl who died in a pond under his supervisory structure, "was three feet or six feet (tall)." (Id. at 84.) The statement contains not only a disregard for Swannie but an actual display of contempt related to Swannie's death. This extreme lack of concern can only be intentional and malicious.

The lifeguards' reactions mimic Hoeppner's disposition in that they were as callous and contemptful of Swannie's life as expressed by Hoeppner at his deposition. The only instruction given to the lifeguards about their actions on the date in question was "speak with no one." (Id. ¶ 91.) When the head lifeguard was asked about his duty to protect small children, he acted as if it was a game. He stated that he had the discretion not to help small children if there was a shark in the water, or if there was a bomb. (Id. ¶ 92.) Hoeppner and the head lifeguard expressed more callous disregard for Swannie's death than concern as to how it occurred sight unseen by a single lifeguard.

Defendants' summary judgment brief fails to address any of the facts that support the inference that their actions were malicious, that their lifeguards were untrained and more concerned

23

with their own safety, that on the day Swannie died none of them remember seeing. After the fact none of them cared to figure out how this tragic event occurred. Instead, defendants simply cite to other cases in which children drowned at public facilities. None involved a malicious failure to warn, take action, or investigate. (D. 37, p. 21.) West Bend ignores undisputed facts that establish the inference of its employees' malicious actions because their actions cannot be explained. Ignoring basic facts does not make them go away.

### 2. Discretionary immunity does not bar the Plaintiffs' state law claims.

Section 893.80(4) of the Wisconsin Statutes provides immunity for political corporations and its employees for "acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." Municipal immunity is the exception rather than the rule. *Linville v. City of Janesville*, 174 Wis.2d 571, 587 (Ct. App. 1993). No immunity from suit attaches to the negligent performance of a ministerial duty. *Id.* at 584. A ministerial duty is one that is absolute, certain and imperative, rather than one in which an employee's discretion is involved. Id.

The lifeguard handbook contained a number of policies and procedures that were mandatory for the lifeguards to follow, which included: a) All patrons that go into the Murky pond above their armpits must be swim tested to determine if they are strong enough swimmers to go into deeper areas. A successful swim test would be signified by a patron getting a swim test wrist band; b) Any child five years or younger to be within arms-length of their parent while in the Murky pond; c) Promote and encourage accident prevention; d) **"WATCH SMALL CHILDREN!!!"** (Emphasis in original); e) "Lifeguard Duties" include lifeguards are "responsible for preventive life guarding"; f) "Staff Rules and Procedures" require Lifeguards "Check for Wristbands"; g) "*It can't be emphasized enough to watch small children. At times parents can neglect their children*"; and h) "Aquatic Manual & Emergency Response Plan", "Since an actively drowning person can submerge within seconds, it is vital that [lifeguards] visually scan the entire zone within seconds".

(PPFOF ¶ 13, 17, 18, 21, 23, 26.) All of these duties are ministerial. The lifeguards had no discretion in their jobs to accomplish the stated goal of "ensuring" the safety of patrons swimming in the Murky pond.

A governmental employee may have a ministerial duty to take some action, although how that act is performed is discretionary. *Rolland v. County of Milwaukee,* 2001 WI App 53, ¶ 12. In *Rolland*, the Plaintiff survived summary judgment when she was injured after her motorized handicapped scooter tipped over on a county bus. There was an issue of fact as to whether the bus driver secured her scooter at all. The defendant was found to have a ministerial duty to secure the scooter on the bus. Id. at ¶ 12. However, he had no discretion to fail to secure the scooter. Because there were facts that supported the conclusion that he did not secure the scooter at all, summary judgment was denied. Id.

Here, there are undisputed facts that support the conclusion the lifeguards did not lifeguard at all related to Swannie's death. By implementing mandatory policies and procedures, West Bend required the lifeguards constantly scan the zones of the Murky pond and the surrounding beach within seconds to ensure the safety of all patrons and to proactively prevent accidents by enforcing the beach rules, which included ensuring any child five years or younger be within arm's reach of an adult while in the pond, watching small children closely, not allowing any patron in water above their arm pits without a swim-test wristband, not allowing anyone without a swim wristband to be swimming, and knowing the hidden dangers of the pond. (PPFOF, ¶ 14, 15, 17, 20, 22, 24.)

During the time that Swannie played in the Murky pond, she was never within arm's reach of an adult and never had a swim test wristband. (Id. ¶ 54, 60.) The On-Duty Lifeguards were all supposed to be continually scanning areas of the Murky pond where Swannie played in the 40 minutes before she drowned sight unseen. (Id. ¶ 25.) All of them admitted their failure to see Swannie at any point in time prior to the lifeless body being carried to shore by a patron. (Id. ¶68,

25

RDPFOF ¶ 38.) Ehmke admitted she was overwhelmed and could not scan her entire zone because of the number of patrons in and around the raft. (Id. ¶ 70.)

Swannie drowned a few feet from the most dangerous area of the pond and in the immediate vicinity of the hidden drop-off - a depression in the bottom of the Murky pond in an area open to small children where another small child had almost drowned earlier in the day. (Id. ¶ 8, 64.) As Swannie waded, swam or floated into deeper water, West Bend's mandatory policies/procedures, and the lifeguards' corresponding duties required they identify Swannie, enforce the rules in place to protect her and undertake timely intervention to prevent Swannie's serious injury and death but they did nothing. (Id. ¶ 17, 18, 19, 58.)

In *Linville*, 174 Wis.2d 571, 578, a 4-year-old boy drowned in a city park open to the public when the van he was a passenger in sunk in the lake after getting stuck in mud. The City moved for summary judgment on the basis of municipal immunity, but was denied immunity because its paramedics did nothing to rescue the 4-year-old boy for twenty minutes after their arrival. Id. at 576. The court concluded the paramedics had a ministerial duty to promptly attempt rescue. Id. Their failure to act on this ministerial duty to protect precluded summary judgment.

Here, the factual scenario on the On-Duty Lifeguards' failure to act on their ministerial duties is far more egregious. They were literally hired to be the guarders of life at the Murky pond with known hidden dangers. (PPFOF ¶ 12.) They were guarders of life with a special emphasis on watching small children, knowing parents can sometimes be neglectful, knowing that any swimmer over their armpits in the Murky pond must first pass a swim test and get a swim test wristband, knowing that visibility was six inches or less from the surface, knowing there are hidden dangers in this aquatic attraction. (Id. ¶ 2, 16, 17, 21, 40, 41.) Yet not a single lifeguard followed a single policy or procedure as it related to Swannie, a small child in the Murky pond above her armpits without

26

adult accompaniment, without being swim tested, without being seen by any of the lifeguards before a patron stepped on her lifeless body on the bottom of the Murky pond.  (Id. ¶ 54, 60, 64.)

There are a multitude of undisputed facts to support the reasonable inference that the lifeguards had a ministerial duty to intervene and take action to guard Swannie's life, and they simply did nothing.  Like *Rolland* and *Linville*, the lifeguards here had a ministerial duty to keep people, with a special emphasis on high risk patrons like small children, free from life-threatening danger.  The lifeguards admit they had a mandatory duty to "**WATCH SMALL CHILDREN!!!**" closely because they are high risk patrons, generally weak swimmers, and something could happen to them very quickly.  (Id. ¶ 15, 21, 22.)  West Bend's "Aquatic Manual & Emergency Response Plan" required that lifeguards "Be attentive at all times,"  "Focus on and promote accident prevention," and "observe and monitor extremes" because  "**It can't be emphasized enough to watch small children.** At times parents can neglect their children."  (Id.  ¶ 13.) On-Duty Lifeguards followed none of these mandatory rules as it relates to Swannie.  These governmental policies and procedures in full force and effect at Regner Park beach, for the purposes of governmental immunity, bear the force of law and were ministerial duties which the lifeguards ignored to the deadly peril of Swannie. Discretionary immunity does not apply.

### 3.   The Defendants Received Notice of Claims Under §893.80.

Section 893.80(1d) provides that "Failure to give the requisite notice shall not bar action on the claim if the fire company, corporation, subdivision or agency had actual notice of the claim and the claimant shows to the satisfaction of the court that the delay or failure to give the requisite notice has not been prejudicial to the defendant". (emphasis added) West Bend does not and cannot argue that it received no actual notice, but instead complains only Defendant Hoeppner, the Director of Parks, Recreation and Forestry and the person ultimately in charge of Regner Park, was served.  West Bend's argument on notice ends there.

27

In *Olsen v. Spooner Township*, 133 Wis.2d 371, 379 (Ct. App. 1986), the court held that the purpose of the notice of claim was to put the municipality on notice of the claim so it has the opportunity to investigate the claim. West Bend had more than ample notice to investigate the claim, both before and after receiving the timely notice of claim at issue. West Bend police performed a criminal investigation and recommended that Hoeppner perform his own internal investigation. (PPFOF ¶ 79, 80.) Hoeppner declined to do so. (Id. ¶ 82.) Even so, defendants concede in their Motion for a Protective Order that West Bend, through its insurer, conducted a comprehensive investigation of the factual circumstances surrounding Swannie's death shortly after it occurred, and such investigation was done in anticipation of litigation. (D. 32, p. 7.) These facts constitute undisputed evidence that these Defendant were on notice of the claim, investigated the claim and suffered no prejudice whatsoever. Defendants don't even argue prejudice, but instead rely on alleged technical deficiencies not recognized by law.

### 4. The Plaintiffs have Standing to pursue wrongful death claims.

Defendants cite to three inapposite cases to assert that Swannie's minor siblings have no right of recovery under Wis. Stats § 895.04(4) for wrongful death. These cases all involve adult siblings and must be distinguished as a result. Section 895.04(4) provides that "Judgment for damages for pecuniary injury from wrongful death may be awarded to any person entitled to bring a wrongful death action. Additional damages not to exceed $500,000 per occurrence in the case of a deceased minor for loss of society and companionship may be awarded to the spouse, children or parents of the deceased, or to the siblings of the deceased, if the siblings were minors at the time of death." (Emphasis added.) Why don't the defendants address this clear distinction? Why don't the defendants establish in their Proposed Findings any of the siblings' ages for which they seek to preclude recovery for their six year old sister's death as a matter of law? If the lifeguards' combined deliberate indifference or reckless disregard for Swannie's safety does not shock the conscience of

28

the Court, certainly such lack of candor should. Swannie's minor siblings' claims survive summary judgment absent facts that establish they were adults when their sister drowned at the bottom of West Bend's Murky pond. *See also Schultz v. Natwick*, 2002 WI 125, Footnote 8; *Bowen v. American Family Insurance Co.*, 2012 WI App 29, ¶ 21.

### 5. There Are Facts Supporting the Conclusion that West Bend Violated the Safe Place Statute.

Under Wis. Stats. § 101.11(1) every employer is responsible for furnishing a safe place for "employees therein and frequenters thereof" and "for furnishing safety devices and safeguards", and adopting and using "methods and processes reasonably adequate" to render such places safe. The Defendants' only argument in favor of summary judgment on Safe Place is: 1) there had been no drowning accidents at Regner Park prior to Swannie; and 2) Connie Her stated that she believed the pond was a safe area for children.

Neither supposition has any bearing on the interpretation and/or application of Wisconsin's Safe Place act. The fact that there were no drowning accidents prior to Swannie is the type of negative evidence that the Wisconsin Supreme Court has characterized as only 'slightly probative' in safe place cases, and may not even be admissible at trial. *Hannebaum v. Direnzo & Bomier*, 162 Wis.2d 488, 498-499 (Ct. App. 1991). Considering all reasonable inferences be decided in the non-movant's favor at summary judgment, defendants' argument is dubious, at best.

Defendants then take Connie Her's statement out of context. Her full testimony was she believed the pond was a safe place because there were several lifeguards on duty at all times watching her children. (RDPFOF ¶ 90.) Connie's reliance on the lifeguards was tragically misplaced, but has no bearing on whether West Bend's state-created danger, the Murky pond, with little visibility and hidden dangers is immune from liability under the Safe Place Statute as a matter of law. Undisputed evidence supports the conclusion, even on summary judgment, that the Murky pond was inherently unsafe: a) the buoys in Zone 2 were set at a depth that would be safe for an

29

adult swimmer to walk up to, not a child; b) these buoys were near what the lifeguards described as the most dangerous part of the pond – the deep well; c) there is an uneven, invisible topography at the bottom of the Murky pond; d) there is a hidden drop-off outside the roped-off 'deep well' where the water depth drops suddenly; e) the Murky pond visibility is limited to six inches or less below the surface; and f), none of the patrons are warned of the hidden dangers of the Murky pond.  (PPFOF ¶ 2, 5, 8, 9.) If that is not enough, West Bend's own expert opined the Murky pond was an open and obvious danger and inherently unsafe due to the reduced visibility below the surface.  (Id. ¶ 94.) Any one of these undisputed facts singularly rendered the Murky pond less safe than reasonable under the circumstances.  When considered in conjunction, it is clear Swannie should receive judgment as a matter of law that West Bend violated the Safe Place statute when it created this dangerous, Murky pond.  The defendants knew of all of these conditions because they filled the pond, set up the buoys and were supposed to train lifeguards on the hidden dangers every year. Summary judgment on safe place for defendants is inappropriate.

## IV.     CONCLUSION.

**WHEREFORE,** the plaintiffs respectfully request the defendants' motion for summary judgment be denied in all respects.

By: <u>s/ David J. Lang</u>
David J. Lang
JUDGE LANG & KATERS, LLC.
8112 W. Bluemound Road, Ste. 101
Wauwatosa, WI 53213
P: (414) 777-0778
F: (414) 777-0776
dlang@jlk-law.com