UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

THE ESTATE OF SWANNIE HER, et al.,

    Plaintiffs,

v.

                                      Case No: 17-CV-1015

CRAIG SADNOWNIKOW, et al.,

    Defendants.

## PLAINTIFFS' PROPOSED FINDINGS OF FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Civil L.R. 56, Plaintiffs respectfully submit the following proposed findings of fact in opposition to Defendants' Motion for Summary Judgment.

### LAYOUT AND STATUS OF REGNER PARK POND ON JUNE 11, 2016

1. The Regner Park pond is a man-made aquatic attraction that holds natural water that is pumped from the spring into the pond from two wells. The pond is drained each fall, at the end of the season. (Lang Ex. 3, 1/17/18 Deposition of Brogan Zochert ("Zochert Depo.") p. 34:5-9.) (Lang Ex., 8, 3/6/18 Deposition of Craig Hoeppner ("Hoeppner Depo.") p. 86: 14-20.)

2. The Pond is always murky ("the Murky pond") with a muck/mud bottom, the bottom of the Murky pond cannot be seen more than two feet in from the shore and visibility beneath the surface is less than 6 inches, lifeguards could not see more than a foot in front of their faces while swimming. (Lang Aff., Ex. 4, 1/19/18 Deposition of Abigail Ehmke ("Ehmke Depo."), p. 5:25-6:3); (Lang Ex. 5, 1/17/18 Deposition of Madeline Kaphingst ("Kaphingst Depo."), p. 8:12-17; 47:16-20.); (Lang Aff., Ex. 10, 1/19/18 Deposition of Noah Wilkens ("Wilkens Depo."), p. 18:4-8.); (Lang Ex. 3, Zochert Depo. 33:14-21.)

3. The Murky pond is divided into a children's play area, a diving raft area, and a general area; for lifeguarding responsibilities, the general area is Zone 1; the diving raft area is Zone 2; the children's play area is Zone 3. (Lang Aff., Ex. 3, Zochert Depo., p. 34; Lang Aff., Ex. 19, Map Of Regner Park.)

4. Small children would generally stay on the east side of the Murky pond in the part known as Zone 3, which is marked by a rope and buoys. (Lang Aff., Ex. 4, 1/19/18 Deposition of Abigail Ehmke ("Ehmke Depo."), p. 43:15-44:10.)

5. On the north and south sides of Zone 2, there are sandy beaches. There is a gradual slope in the Murky pond to the deep water, and a rope with buoys where the water gets deeper; the ropes are where the water is approximately eight feet deep on the north side of the pond and approximately six feet deep on the south side of the pond. (Lang Ex. 4, Ehmke Depo., p. 46:13-47:19; Lang Aff. Ex. 12, Recorded Statement of Mykalene Bordeau, ("Bordeau Statement"), p. 17, ln. 459-471.)

6. The lifeguard on the raft can only see six inches below the surface in Zone 2. (Lang Aff. Ex. 4, Ehmke Depo., p. 56:19-25.)

7. On June 11, 2016, there were approximately 800 paid patrons at Regner Park and there were around 200 patrons in the Murky pond when Swannie drowned. (Lang Aff., Ex. 3, Zochert Depo. pp. 27-28.)

8. There was an area in Zone 2 of the pond, where a child earlier on June 11, 2016, went under the water surface within seconds because of a hidden drop-off. (Lang Ex. 11, 5/22/18 Deposition of Phueng Cha ("Cha Depo."), pp. 44:14 – 45:2; 45:18 – 46:12.)

9. Despite the inherently unsafe nature of the Murky pond with little to no visibility in the water and the unknown topography on the bottom, none of the lifeguards received any

2

training on how treat this aquatic attraction different from a pool. (Lang Ex. 3., Zochert Depo., p. 72:13-23; Lang Ex. 8, Hoeppner Depo., p. 26:6-12.)

10. The lifeguards on duty the day that Swannie Her drowned were all nineteen years of age, or younger. (Lang Aff. Ex. 4, Ehmke Depo. p. 4: 8-10; Lang Aff. Ex. 5, Kaphingst Depo. p. 5: 17-21; Lang Aff. Ex. 7, 1/18/18 Deposition of Michaela Millard, ("Millard Depo."), p. 5: 18-19; Lang Aff. Ex. 10, Wilkins Depo. p. 4:22; Lang Aff. Ex. 6, 1/18/18 Deposition of Ryan Zamzow ("Zamzow Depo.") p. 6:4-5; Lang Aff. Ex. 3, Zochert Depo., p. 4:13.)

11. The experience of the lifeguards on duty was: i) three were working their first lifeguarding job and each had less than one month of experience (Lang Aff. Ex. 3, Zochert Depo., p. 7:4; Lang Aff. Ex. 10, Wilkins Depo. p. 5:22-25.; Lang Aff. Ex. 5, Kaphingst Depo. p. 5:17-21.); ii) Ryan Zamzow, the head lifeguard on duty had one summer's lifeguarding experience at the Murky pond (Lang Aff. Ex. 10, Zamzow Depo. p. 6:4-5.); Abigail Ehmke had one summer of experience lifeguarding at the Murky pond (Lang Aff. Ex.4, Ehmke Depo. P. 7: 4-5); and Michaela Millard had one year and four months of experience lifeguarding at other venues. (Lang Aff. Ex. 7, Millard Depo. p. 6:11-21.)

## LIFEGUARD AND POND POLICIES/PROCEDURES

12. The West Bend Aquatic Manual & Emergency Response Plan provides that: "As a professional lifeguard, your primary responsibility is to protect the life and wellbeing of each person using Regner Park Beach." (Lang Aff. Ex. 3, Zochert Depo., p. 107:4-21; Lang Aff. Ex. 2, City of West Bend Aquatic Manual & Emergency Response Plan ("Manual"), p. 2).

13. The Lifeguarding Duties and Principles for lifeguards at Regner Beach require lifeguards:

   a. Be attentive at all times! (Lang Aff. Ex. 21, Lifeguard Training Power Point Presentation ("Lifeguard Training"), p. 22)

3

b. Focus on and promote accident prevention! (Lang Aff. Ex. 21, Lifeguard Training, p. 22)
c. Enforce all beach rules. (Lang Aff. Ex. 21, Lifeguard Training, p. 22)
d. Observe and monitor the extremes – the highly active and over confident swimmer, and the highly passive and unskilled swimmer, as well as the high risk patrons, such as the elderly, intoxicated, obese and swimmers with small children. **It can't be emphasized enough to watch small children**. At times, parents can neglect their children. (Lang Aff. Ex. 21, Lifeguard Training, p. 24; Lang Aff. Ex. 3, Zochert Depo., pp. 87:13; 112:21-25.)(emphasis added)
e. Standards and expectations, relating to your performance, are extremely high. As a result, you possess a great deal of authority to act on behalf of the City. It's critical to focus on prevention and early intervention. (Lang Aff. Ex. 2, Manual, p. 2.)

14. Watching small children was a mandatory requirement for all lifeguards at the Murky pond. (Lang Aff., Ex. 6, Zamzow Depo. pp. 26:24-27:2.; Lang Aff., Ex. 4, Ehmke Depo. p. 27:15-19; Lang Aff., Ex. 7, Millard Depo. pp. 34:19-35:17; Lang Aff., Ex. 21 Lifeguard Training Power Point Presentation ("Lifeguard Training"), p.24.)

15. Lifeguards at the Murky pond must watch and protect small children because they are not as strong or skilled swimmers. (Lang Aff., Ex. 6, Zamzow Depo. pp. 28:18-29:5; Lang Aff., Ex. 7, Millard Depo. pp. 32:7-33:9)

16. The primary responsibility of a lifeguard is to protect the life of swimmers and people that were frequenting the Murky pond and they were required to watch and protect small children because they are not as strong or skilled swimmers. (Lang Aff., Ex. 6, Zamzow Depo. p. 37:12-15; 28:18 – 29:5; Lang Aff., Ex. 7, Millard Depo. pp. 32:7 - 33:9; Lang Aff., Ex. 4, Ehmke Depo. p. 65:13-17.)

17. It was mandatory for lifeguards at Regner Park to enforce the rules: 1) that all swimmers wear wristbands and 2) that an adult must accompany children under the age of five at all times and must be within arm's reach. Those two rules were in place to ensure the safety of children. (Lang Aff., Ex. 6, Zamzow Depo. pp. 45:8 - 46:24; Lang Aff., Ex 3, Zochart Depo. p.

4

23:21-24; Lang Aff., Ex. 7, Millard Depo. pp. 34:19-35:17; Lang Aff., Ex. 5, Kaphingst Depo. pp. 28:1 - 29:6.)

18. If a child is in the water and is five years or younger with no adult within arm's length, the lifeguards must have the child removed from the water. There is no discretion in that regard. (Lang Aff., Ex. 6, Zamzow Depo., p. 101: 8-14.)

19. If a child in the water without parental supervision looked small, and a lifeguard was unsure of their age, they were required to radio someone in the beach house to address the issue so the child would be safe. (Lang Aff. Ex. 13, Wittnebel Depo. p. 28:4-19.)

20. Lifeguards have a mandatory duty to observe and monitor extremes, which includes especially watching small children to ensure they are within arm's reach of their parents and checking to ensure they have appropriate wristbands. The purpose of enforcing these mandatory rules is to "ensure" the children's safety. (Lang Aff., Ex. 3, Zochart Depo. pp. 92:14-16, 93:12, 97:12-18, 98:12-13; Lang Aff. Ex. 5, Kaphingst Depo. pp. 28:1-29:2.)

21. "WATCH SMALL CHILDREN!!!" is heavily emphasized in the policies and procedures, "Mostly because parents don't pay attention enough." (Lang Aff., Ex. 8, Hoppner Depo. p. 127: 1-15; Lang Aff. Ex. 21, Lifeguard Training, p. 24.)

22. If a small child is in water up to their waist, a lifeguard in a stand is required to run out and grab the child and then find the parent because the child could go underwater fast. (Lang Aff., Ex. 4, Ehmke Depo. p. 29:8-19.)

23. An entire page of the guidelines, policies and procedures for lifeguards in the Aquatic Manual & Emergency Response Plan is devoted to Zone Coverage & Scanning, and provides:

> a. "Zone coverage is used to guard Regner Park Beach. With zone coverage, each lifeguard scans a specific area so that all areas of the pond are covered. There

5

will be overlap where zones meet. With zone coverage, it is vital that each lifeguard know all zones under all possible guard positions and staffing patterns." (Lang Aff. Ex. 2, Manual, p. 21)

b. "Since an actively drowning person can submerge within seconds, it is vital that you visually scan the entire zone within seconds. If you are unable to comfortably scan your zone within this time frame, request for additional staff immediately." (Lang Aff. Ex. 2, Manual, p. 21)

c. With zone coverage, scanning becomes your primary instrument, which consists of a variety of visual observation techniques – all with the purpose of observing swimmers while remaining interested and alert. The following scanning patterns discourage you looking at the same area or 'zone' continuously.
   i. Horizontal Scanning
   ii. Vertical Scanning
   iii. Circular Scanning
   iv. Triangle Scanning
   v. Figure Eight Scanning. (Lang Aff. Ex. 2, Manual, p. 21.)

d. Any, or all of these patterns can be incorporated into a scanning strategy. A 20-minute period can be broken down into 4, five-minute segments for scanning. The five-minute scanning strategy will allow you some mental exercise that increases both attentiveness and responsiveness. The scan area contains a constantly changing environment. People move in and out of the area, activities change, and environmental factors such as sun glare and shadows change. These ever changing factors create the need for constant and varied scanning. (Lang Aff. Ex. 2, Manual, p. 22; Lang Aff. Ex. 3, Zochert Depo., p. 4:39; Lang Aff. Ex. 21, Lifeguard Training, p. 29.)

24. If a lifeguard monitoring one zone of the Murky pond sees a small child going into the water in a different zone without parental supervision, that lifeguard is required to act to have the child removed from the pond. (Lang Aff., Ex. 6, Zamzow Depo. pp. 109:10 - 111:20.)

25. It is mandatory for lifeguards at the Murky pond to know their zones and to scan their zones within seconds, if a lifeguard cannot comfortably scan their zone within seconds, then more staff is required, and a supervisor must be notified. (Lang Aff., Ex. 4, Ehmke Depo. pp. 31:15-24; 32:1-4.)

26. No swimmer was allowed in water over their arm pits without a swim test wristband. The swim test wristband was only issued to patrons who passed a mandatory swim

6

test. It was a different color and put on the opposite wrist of the patron wristband to clearly distinguish which patrons were allowed in water above their arm pits. (Lang Aff., Ex. 3, Zochart Depo. pp. 25:7-26:21.)

27. Lifeguard staff are always required to be close enough to reach any potential victim within seconds and to be attentive. (Lang Aff. Ex. 8, Hoeppner Depo., p. 121.)

## **LIFEGUARD TRAINING**

28. Mykalene Bordeau was the Recreational supervisor for the city of West Bend on June 11, 2016. (Lang Aff. Ex. 9, 3/15/18 Deposition of Mykalene Bordeau ("Bordeau Depo."), p. 5: 16-23.)

29. Ms. Bordeau's administered training to all lifeguards present at the Murky pond on June 11, 2016. (Lang Aff., Ex. 9, Bordeau Depo. p 13: 2-25.)

30. When Mykalene Bordeau was hired as Recreational Supervisor for West Bend on January 1, 2016, there was no check done into whether she had any experience or background supervising an aquatic facility, or whether she had been a lifeguard before or whether she had any Red Cross Lifeguard Certification. (Lang Aff. Ex. 8, Hoeppner Depo. pp. 21:1- 22:1.)

31. Mykalene Bordeau did not have any lifeguard certification or experience when she was hired as the Recreational Supervisor for West Bend; the position of Recreational Supervisor included overseeing and training the lifeguards at Regner Park pond. (Lang Aff. Ex. 8, Hoeppner Depo. p. 23:8-10; Lang Aff. Ex. 9, Bordeau Depo., p. 8:19-23.)

32. Craig Hoeppner, the West Bend Director of Parks, Recreation and Forestry, never had any discussion with Mykalene Bordeau regarding how lifeguarding in a pool was different from lifeguarding in a pond. (Lang Aff. Ex. 8, Hoeppner Depo. 26:6-12.)

7

33. Craig Hoeppner was not aware of any ways lifeguards were trained differently for lifeguarding in a pond than lifeguarding in a pool. (Lang Aff. Ex. 8, Hoeppner Depo. p. 28:3-7.)

34. Mykalene Bordeau took her lifeguard certification from the Red Cross in January or February 2016, which consisted of two weekends and received no training from the previous recreation supervisor. (Lang Aff. Ex. 9, Bordeau Depo. p. 6:20-25; 7:16-18.)

35. Mykalene Bordeau could not state one difference between open water lifeguarding with limited visibility and life guarding in a pool. (Lang Aff. Ex. 9, Bordeau Depo. p. 10:10-18.)

36. Mykalene Bordeau did not remember how she trained lifeguards regarding open water with limited visibility versus a pool setting. (Lang Aff. Ex. 9, Bordeau Depo., p. 11:1-18.)

37. Mykalene Bordeau did not receive any training in how to train the lifeguards before she started training the lifeguards. (Lang Aff. Ex. 9, Bordeau Depo. p. 12:12-14.)

38. Mykalene Bordeau ran through a power point presentation on the duties of lifeguards at Regner Park as part of their training, but she received no training on the power point presentation prior to giving the presentation, including the purpose of the Emergency Action Plan. (Lang Aff. Ex. 8, Bordau Depo. pp. 13:23-16:23.)

39. Mykalene Bordeau had no knowledge of the hidden dangers in the Murky pond. (Lang Aff. Ex. 9, Bordeau Depo. p. 17:9-11.)

40. Lifeguards went through a training program prior to the season, which included a power point presentation emphasizing mandatory policies and procedures in place at the Murky pond for the safety of patrons, a copy of which was given to the lifeguards. (Lang Aff. Ex. 13, Deposition of Lauren Wittnebel ("Wittnebel Depo."), p. 9:11-23.)

41. The lifeguards referred to Zone 2 as the "deep well," which is the part of the Murky pond that no one was allowed to enter without a swim test wristband received only after passing a swim test. (Lang Aff. Ex. 13 Wittnebel Depo., pp. 21:13 - 22:13.)

42. Lifeguards were required to enforce the rules as written in the policies and procedures to ensure the welfare and safety of the patrons. (Lang Aff. Ex. 13, Wittnebel Depo. p. 26:8-17.)

43. The deep well around the raft was a hidden danger because somebody who is near the raft and goes down to the bottom cannot be seen unless lifeguards engage in the sweep-the-bottom search-and-rescue. (Lang Aff. Ex. 13, Wittnebel Depo. pp. 32:22 - 33:8.)

44. Lauren Wittnebel, the previous Recreation Supervisor prior to Mykalene Bordeau taught the lifeguards to move people away from the deep well because of the danger. (Lang Aff. Ex. 13, Wittnebel Depo. p. 33:12-15.)

45. The initial lifeguard training for the Murky pond was at the West Bend high school pool. (Lang Aff. Ex. 7, Millard Depo. p. 7:16-17.)

46. Training at the Murky pond did not focus on scanning issues or other early prevention issues unique to open water, but rather on search and rescue efforts. (Lang Aff. Ex. 7, Millard Depo. p. 8:7-13.)

47. The lifeguards were never trained on how to scan the water. (Lang Aff. Ex. 3, Zochart Depo. pp. 53:21-54:3.)

48. Despite policy/procedures to the contrary, the lifeguards were not trained to pay any extra attention to patrons in more than a foot-and-a-half of water, where lifeguards could not see them after they went below the surface of the water and were not given any special training

9

on how to lifeguard in low-visibility water. (Lang Aff., Ex. 3, Zochart Depo. pp. 68:18-24; 72:20-23.)

## SWANNIE HER'S ARRIVAL TO REGNER PARK

49. Upon arrival on June 11, 2016, Swannie Her ("Swannie"), Thavon Her, and Chuzeng Her received wristbands indicating paid admission to enter Regner Park Pond. (Lang Aff., Ex. 1, 3/27/18 Deposition of Connie Her ("Connie Depo."), p. 46:17-25.)

50. Connie Her ("Connie"), Swannie's mother and her uncle chipped in to make sure they had enough money to buy all the children admittance bands for the Murky pond, and paid for all of the children's admittance on June 11, 2016. (Lang Aff., Ex. 1, Connie Depo., p. 46:17-25

51. The only rule that Connie was made aware when she entered Regner Park was everyone needed a wrist band to enter the facility. Connie and her uncle chipped in and made sure that they had enough money to buy each child a band. (Lang Aff. Ex. 1, Connie Depo., p. 46:17-25; 64:6-10.)

## SWANNIE'S DEATH

52. Swannie Her arrived at the park shortly after 5:00, put on her swimsuit and went to go swimming with her sisters. Lang Aff., Ex. 17, Supplementary Police Report of Jacob Chihak ("Chihak Report"), p. 2.)

53. After arriving at the Murky pond, Swannie put on her swimsuit and her mother, Connie Her, gave Swannie permission to go into the water with her siblings. (Lang Aff., Ex. 1, Connie Depo., pp.60:3-15; 61:15-20.)

10

54. The Her children, Thavon (age 14), Jasmine (age 10), Evangelin (age 9), Ekin (age 12) and Swannie went to the beach together without adults. (Lang Aff., Ex. 142, 4/17/18 Deposition of Thavon Her, ("Thavon Depo."), p. 26:21-25.)

55. The Her children all went into the water together in Zone 3, the children's area. (Lang Ex. 14, Thavon Depo. p. 26:21-25; p. 27:6-10.)

56. Ekin went to play tag with his cousins, and the girls stayed in a shallower area of the Murky pond to play volleyball. (Lang Ex. 14, Thavon Depo. p. 27:1-10.)

57. Swannie told Thavon she wanted to go play with Ekin. (Lang Ex. 14, Thavon Depo. p. 29:8-10.)

58. Evangelin and Swannie swam halfway to get to Ekin, but then they got out of the water and walked around the beach before going back in the water towards Ekin. (Lang Ex. 14, Thavon Depo. p. 29:1-23.)

59. Ekin was swimming near the "deep well" area before Swannie was found. (Lang Ex. 15, Deposition of Ekin Her ("Ekin Depo."), p. 17:8-11)

60. Swannie did not have a swim test wristband on when she was found on the bottom of the pond and none of the lifeguards recall swim testing Swannie. (Lang Ex. 1, Connie Depo. p. 46:17-25; Lang Ex. 146, Deposition of Jasmine Her ("Jasmine Depo."), p. 15:20-21.)

61. No lifeguard swim tested Swannie, she did not have the swim wristband and should not have been allowed access to Zone 2. If Swannie was seen in Zone 2 she should have been removed by lifeguards. (Lang Aff. Ex. 7, Millard Depo. p. 37: 1-10; Lang Aff. Ex. 4, Ehmke Depo. p. 76: 15-25; Lang Aff. Ex. 5, Kaphingst Depo. pp. 16: 11 - 17:12).

62. Swannie was found unresponsive at the bottom of the pond by an adult male patron in water up to his chest, and Brogan Zochart saw the patron carrying Swannie toward the

11

south side of zone two after she heard him yelling for help. (Lang Aff. Ex. 3, Zochart Depo. pp. 48:16-51:8.)

63. Swannie was on the bottom of the pond for approximately ten minutes before she was found. (Lang Aff., Ex. 3, Zochart Depo. p. 88:13-24.)

64. Swannie's lifeless body was found a few feet from the most dangerous area of the pond, the "deep well" at approximately 5:55 PM. (Lang Aff., Ex. 3, Zochart Depo., p. 102:15-24; Lang Aff., Ex. 20, Police Report of Thomas Lichtensteiger, p. 1; Lang Aff., Ex. 17 Chihak Report, p. 2).

65. After Swannie was pulled from the Murky pond, she did not regain a pulse, start breathing or regain consciousness. Swannie did not speak, her eyes were open, but did not focus on anything. Abigail Ehmke did not know whether Swannie was alive or dead. (Lang Aff., Ex. 4, Ehmke Depo. pp. 71:14-72:16.)

**LIFEGUARD ROTATION AND INACTION WHILE SWANNIE WAS IN THE WATER**

66. Lifeguards rotate from Zone 3 (kids), to Zone 1 (general adult area), to Zone 2 (raft and deep well), to the swim test, to inside the beach house for two rotations. (Lang Aff., Ex. 3, Zochert Depo., 44:13-46:6.)

67. When Swannie Her was found at approximately 5:50, the lifeguards were approximately five minutes into a rotation during which the following lifeguards were in the following areas:

> Swim Test: Abigail Ehmke (Lang Aff., Ex. 4, Ehmke Depo., p. 36: 11-22.)
>
> Zone 2 (Swim Raft): Brogan Zochart (Lang Aff., Ex. 3, Zochart Depo., p. 48: 12-25.)

12

Zone 1: Madeline Kaphingst (Lang Aff., Ex. 5, Kaphingst Depo., p. 22:2-16.)

Zone 3: Cassidy Holbrook. (Lang Aff., Ex. 3, Zochart Depo., p. 62; Lang Aff., Ex. 6, p. 31.)

68. Even though Swannie had been in and out of the water for approximately 40 minutes before she was found, and these lifeguards were responsible for scanning their zones every 8-10 seconds, none of these lifeguards ever saw Swannie before she drown. (Lang Aff., Ex. 3, Zochart Depo., pp. 44, 45, 78:18-24, 102:15-24; Lang Aff., Ex. 20, Police Report of Thomas Lichtensteiger, p. 1; Lang Aff., Ex. 17 Chihak Report, p. 2).

69. Ten minutes before Swannie drown at the bottom of the Murky pond, Abigail Ehmke was assigned to the swim raft lifeguard position. (Lang Aff., Ex. 4, Ehmke Depo. p. 45:6.)

70. In her recorded statement, Abigail Ehmke stated that she felt overwhelmed with the amount of people in the water and that when she was lifeguarding on the raft she should have asked for another lifeguard on the raft "because there were a lot of people on and around the raft." (Lang Aff., Ex. 22, Recorded Statements of Abigail Ehmke from Interviews taken by Pohlman, ("Recorded Statements"), p. 11, line 294-303.)

71. The lifeguard on the raft is responsible for watching the beaches on the north and south sides of Zone 2. (Lang Aff., Ex. 4, Ehmke Depo. p. 46:7-12.)

72. If Abigail Ehmke had seen Swannie in water up to her waist coming without a parent within arm's reach, she would have removed Swannie from the water. (Lang Aff., Ex. 4, Ehmke Depo. p. 51:15-21.)

13

73. Abigail Ehmke did not see Swannie in the water on June 11, 2016. She was on the raft scanning the water for 20 minutes prior to the shift change with Brogan Zochert who was stationed at the raft when Swannie was found at the bottom of the pond. (Lang Aff., Ex. 4, Ehmke Depo. p. 51:9-25; Lang Aff., Ex. 3, Zochert Depo. pp. 43:23 – 44:10.)

74. In the five minutes prior to Swannie being pulled from the Murky pond, Ryan Zamzow, as the head lifeguard, was observing Abigail Ehmke attempt to swim test two intoxicated male adults. (Lang Aff. Ex. 6, Zamzow Depo. pp. 114:18-119:9.)

75. At the time that Abigail Ehmke heard the three whistles relating to Swannie's emergency, she was still dealing with the two intoxicated adult males who refused to take the swim test. (Lang Aff., Ex. 4, Ehmke Depo. p. 36:11-38:19.)

76. Brogan Zochart was the lifeguard responsible for guarding Zone 3 when the small Her children were playing in the water with no adults nearby; she never saw Swannie or enforced the mandatory rule of a parent being within arm's reach of a small child. (Lang Aff., Ex. 3, Zochert Depo. p. 44, 45, 78:18-24.)

77. Madeline Kaphingst was responsible for lifeguarding Zone 3 when Swannie, a six-year old was swimming and moving from Zone 3, the children's area, to Zone 2, the area containing the "deep well"; Madeline Kaphingst never saw Swannie that day and never enforced the mandatory rule that Swannie could not be in the water without an adult within arm's reach or that she must be removed from the water if she was in water up to her waist absent a swim test. (Lang Aff. Ex. 23, Recorded Statement Kaphingst, pp. ¶ 61-67, 74-84, 127-142.)

78. Ryan Zamzow was the head lifeguard overseeing the Murky pond at Regner Park at a time when there were over 200 patrons in the pond being overseen by three lifeguards, one of his lifeguards was overwhelmed and he never saw Swannie because he was in the beachhouse

not watching the water, until he was called out to watch over two intoxicated patrons refusing to take a swim test. (Lang Aff. Ex. 24, Recorded Statement of Zamzow p. 9 252-253, Lang Aff. Ex. 23, Recorded Statement Kaphingst, ¶ 86-92.)

## POST INCIDENT ACTIONS

79. Following the incident, the West Bend Police Department conducted a criminal investigation into Swannie's death. (Lang Aff. Ex. 18, 3/6/18 Deposition of Kenneth Meuler, ("Meuler Depo."), pp. 13:7-16; 16: 11 – 17: 22).

80. Chief Meuler emailed Craig Hoeppner that an internal investigation of the lifeguards' actions can be conducted on whether policies and procedures were followed and the Chief offered one of his investigators to assist. (Lang Aff. Ex. 18, Meuler Depo., pp. 25-26: 13-25; 29-30: 25-22; 32:6-15); (Lang Aff. Ex. 8, Hoppener Depo., pp. 69-71.)

81. The Emergency Action Plan required that "immediately following an occurrence, incident reports are to be completed." (Lang Aff. Ex. 8, Hoppner Depo. pp. 89-91.)

82. No incident reports for Swannie's death were done, and despite the Police Chief's direction and offer to assist, Hoeppner chose not to conduct any internal investigation on whether his lifeguards followed policies and procedures. (Lang Aff. Ex. 8, Hoeppner Depo. pp. 58-59, 65:7-22; pp. 68, 69-73, 84-92.)

83. Hoeppner did not have any conversations with the lifeguards if policies were followed. (Lang Aff. Ex. 8, Hoeppner Depo., p. 67.)

84. Hoeppner did not know whether Swannie was a small child, whether she was three feet tall or six feet tall, and refused to conduct an internal investigation surrounding the events and circumstances leading up to Swannie's death. (Lang Aff. Ex. 8, Hoeppner Depo., 119:3-9.)

15

85. After Swannie's death an additional lifeguard was added to the regular rotation of lifeguards, and that lifeguard would walk the beach around the circumference of the Murky pond. (Lang Aff. Ex. 4, Ehmke Depo. p. 9:6-10.)

86. A debriefing of the lifeguards took place the day after Swannie died, yet nothing was discussed about how Swannie was able to enter the Murky pond sight unseen by any lifeguard or how she was ultimately found by a patron at the bottom. (Lang Aff. Ex. 4, Ehmke Depo. p. 22:24-23:5; Lang Aff. Ex. 3, Zochert Depo. p. 15:18-25; Lang Aff. Ex. 7, Millard Depo. p. 27:4-15; Lang Aff. Ex. 5, Kaphingst Depo. p. 16:17-20.)

87. Ms. Bordeau was responsible for supervising the lifeguards on June 11, 2016. (Lang Aff. Ex. 9, Bordeau Depo. pp. 12-13: 15-2.)

88. Ms. Bordeau never had a discussion with lifeguards about how Swannie drown. (Lang Aff., Ex. 9, Bordeau Depo. pp 28: 14-22, 29: 7-14.)

89. Ms. Bordeau did not make any attempt to determine how Swannie, a small child, drown at the Murky pond. (Lang Aff. Ex. 9, Bordeau Depo. pp. 29-30: 25-3, 37: 23-25.)

90. Ms. Bordeau did not ask any of the lifeguards present on June 11, 2016, if they had followed the rules, policies or procedures and never discussed Swannie's drowning with her supervisor Craig Hoeppner. (Lang Aff. Ex. 9, Bordeau Depo. pp. 30-32: 16-20; 38:1-5; 55: 13-19.)

91. After Swannie Her's drowning, the lifeguards were told not to talk to anyone about the incident. (Lang Aff. Ex. 6 Zamzow Depo. p. 30: 12-18;

92. At his deposition, Ryan Zamzow testified that his duty to rescue a drowning child was discretionary if there was a shark in the water at the pond and that they did not have the duty

16

to actively diffuse a bomb to promote and encourage accident prevention. (Lang Aff. Ex. 6, Zamzow Depo. p. 23:6-21; 25:1-8.)

93. Ryan Zamzow, as the supervising lifeguard on duty, testified he did not know where Swannie Her was when she drowned until this lawsuit was filed and that he had no knowledge of how Swannie Her was allowed to drown by the lifeguards he supervised. Instead, he stated "I was not on the stand when she drowned, so I don't know, and I cannot answer that. You'll have to talk to them." (Lang Aff., Ex. 6, Zamzow Depo. p. 56:13-58:23, 123:9-13.)

94. As part of the present litigation, the Defendants produced an expert report of Juliene R. Hefter, in which she opined that "**Swimming may be an inherently dangerous activity. The risk of drowning is ever-present and is considered to be an open and obvious danger inherent in all water-based recreational activities, especially at a facility where you can obviously tell that you cannot see below the surface of the water.**" (Lang Aff. Ex. 25, Expert Report of Juliene R. Hefter, p.4.)

Dated this 31st of August 31, 2018,

By: s/ David J. Lang
David J. Lang
JUDGE LANG & KATERS, LLC.
8112 W. Bluemound Road, Ste. 101
Wauwatosa, WI 53213
P: (414) 777-0778
F: (414) 777-0776
dlang@jlk-law.com

and-

**Gende Law Office, S.C.**
By: s/ James J. Gende II
James J. Gende II (SBN: 1030921)
GENDE LAW OFFICE, S.C.
N28W2300 Roundy Dr., Ste. 200
Pewaukee, WI 53072
P: (262) 970-8500
F: (262) 970-7100

17

JGende@jamesgendelaw.com
Attorneys for Plaintiffs