# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ESTATE OF SWANNIE HER, et al.,**

   Plaintiffs,

  v.                                          Case No. 17-CV-1015

**KRAIG SADOWNIKOW, et al.,**

   Defendants.

---

## DECISION AND ORDER ON DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT

---

This action arises from the tragic drowning death of six-year-old Swannie Her on June 11, 2016 at the City of West Bend's Regner Park. The plaintiffs are the estate of Swannie Her, her parents, and her nine siblings (collectively "the plaintiffs"). The defendants are the City of West Bend ("the City"), the City's insurer, Parks and Recreation Director Craig Hoeppner, and the lifeguards working the day of the incident (collectively "the defendants"). The plaintiffs allege federal and state law causes of action against the defendants, including a "Fourteenth Amendment Deprivation," negligence, violation of Wisconsin's Safe Place Statute, and wrongful death. (Amended Complaint, Docket # 17.) The defendants have moved for summary judgment arguing that the plaintiffs cannot show a constitutional violation under the Fourteenth Amendment. For the reasons explained below, the defendants' motion for summary judgment is granted.

## UNDISPUTED FACTS

The City of West Bend's Regner Park pond is a man-made pond that holds natural water that is pumped from the spring into the pond from two wells. (Pls.' Proposed Findings of Fact ("PPFOF") ¶ 1, Docket # 60 and Defs.' Response to PPFOF ("Defs.' Resp.") ¶ 1, Docket # 64.) The pond is always murky with a muck/mud bottom. The bottom of the pond cannot be seen more than two feet in from the shore and visibility beneath the surface is less than six inches; lifeguards could not see more than a foot in front of their faces while swimming. (*Id.* ¶ 2.) The pond is divided into a children's play area, a diving raft area, and a general area; for lifeguarding responsibilities, the general area is Zone 1; the diving raft area is Zone 2; and the children's play area is Zone 3. (*Id.* ¶ 3.) Small children would generally stay on the east side of the pond in the part known as Zone 3, which is marked by a rope and buoys. (*Id.* ¶ 4.) On the north and south sides of Zone 2, there are sandy beaches. There is a gradual slope in the pond to the deep water, and a rope with buoys where the water gets deeper; the ropes are where the water is approximately eight feet deep on the north side of the pond and approximately six feet deep on the south side of the pond. (*Id.* ¶ 5.)

On June 11, 2016, Connie Her went to Regner Park to attend her two-year-old nephew's birthday party. (Defs.' Proposed Findings of Fact ("DPFOF") ¶ 2, Docket # 38 and Pl.'s Resp. to DPFOF ("Pls.' Resp.") ¶ 2, Docket # 61.) The birthday party took place at a picnic area near the sand/grassy area adjacent to the pond. (*Id.* ¶ 3.) Connie Her initially brought six of her ten children and her boyfriend/fiancé to the pond. (*Id.* ¶¶ 4-5.)

At approximately 3:00 p.m., Connie Her, her boyfriend/fiancé, and two of her children left Regner Park to go pick up her three other children, including six-year-old Swannie Her. (*Id.* ¶ 6.) At that time, those three children lived with their father, Chong Her.

(*Id.*) Connie Her informed Chong Her that "the kids were going to the birthday party" and that "there was a swimming pond at the park that [they] were going to go to." (*Id.* ¶ 8.)

After picking up the children, Connie Her, her boyfriend/fiancé, and the five children drove back to Regner Park and arrived at approximately 5:00 p.m. (*Id.* ¶ 9.) After they arrived back at Regner Park, they went to the area where the birthday party was organized to greet family and friends. (*Id.* ¶ 12.) Shortly after greeting family and friends, Swannie put her swimsuit on and obtained Connie Her's permission to go in the pond with her siblings. (*Id.* ¶ 13.) Connie Her did not accompany Swannie to the pond. (*Id.* ¶ 14.) At some point, Swannie told her siblings that she wanted to go swim and play with her other sibling who was in the deeper area of the pond. (*Id.* ¶ 37.) The parties dispute when Swannie went beneath the surface of the water; however, the parties agree that Swannie was found unresponsive at approximately 5:50 p.m. at the bottom of the pond by an adult male patron in water up to his chest, and a lifeguard saw the patron carrying Swannie toward the south side of Zone Two after she heard him yelling for help. (PPFOF ¶¶ 62, 67 and Defs.' Resp. ¶¶ 62, 67.) After Swannie was pulled from the pond, she did not regain a pulse, start breathing, or regain consciousness. (*Id.* ¶ 65.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A

dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

The defendants move for summary judgment arguing that the plaintiffs cannot show a constitutional violation under the Fourteenth Amendment and thus the plaintiffs' federal claim should be dismissed. Without the federal claim, the defendants argue I should decline exercising supplemental jurisdiction over the plaintiffs' remaining state law claims. The plaintiffs argue that they do show a constitutional violation under the state-created danger exception to the Due Process Clause. (Pls.' Br. at 5–15, Docket # 59.)

*1. Applicable Law: State-Created Danger Exception*

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). In *DeShaney*, the Supreme Court found that "the Due Process Clause[] generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196. There are, however, two exceptions to *DeShaney*'s general rule. First, when the state has a "special relationship" with the person such as "when it has custody over a person, it must protect him because no alternate avenues of aid exist." Second, under the state-created danger exception, "liability exists when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 916 (7th Cir. 2015) (internal citation and quotation omitted).

To recover under the state-created danger exception, a plaintiff must demonstrate that: (1) the state, by its affirmative acts, created or increased a danger faced by an individual; (2) the failure on the part of the state to protect an individual from such a danger is the proximate cause of the injury to the individual; and (3) the state's failure to protect the individual must shock the conscience. *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817–18 (7th Cir. 2007). "The state-created danger exception is a narrow one." *Doe*, 782 F.3d at 917. The Seventh Circuit explained that the state-created danger exception "must not be interpreted so broadly as to erase the essential distinction between endangering and

failing to protect and thus circumvent *DeShaney*'s general rule. When courts speak of the state's 'increasing' the danger of private violence, they mean the state did something that turned a potential danger into an actual one, rather than that it just stood by and did nothing to prevent private violence." *Id.* (internal quotation and citation omitted). Thus, the cases in which the Seventh Circuit has either found or suggested that liability attaches under the state-created danger exception are "rare and often egregious." *Id.*

Several cases illustrate both the narrowness of the exception and the egregiousness of the state conduct contemplated by the exception. In *Monfils v. Taylor*, 165 F.3d 511 (7th Cir. 1998), Monfils had tipped off the police to a thief at his workplace in a phone call that the police recorded. He repeatedly begged the police not to release the tape to anyone because the thief was a violent person who would recognize his voice. He was assured it would not be released. The thief, however, requested a copy of the tape from the police, and a policeman who did not know about Monfils' fears gave it to him. The thief discovered that Monfils was the informant and killed him. *Id.* at 513–15. The court upheld a jury verdict for the plaintiff because Monfils was safe (or at least much safer) before the police released the tape, without which the thief would have been unlikely to identify the informant. By the act of releasing the tape, the police created the danger to Monfils. *Id.* at 518.

In *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993), a drunk driver crossed the center line of the highway and crashed into the Reeds' car. *Id.* at 1123. Earlier that day, the defendant police officers had arrested the driver of the vehicle, leaving a drunk passenger behind. *Id.* The passenger became the drunk driver who caused the head-on collision approximately two hours later. *Id.* The court found that, although it was hesitant to find § 1983 liability outside the custodial setting, "plaintiffs such as the Reeds may state claims for

civil rights violations if they allege state action that creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a danger that they otherwise would have been." *Id.* at 1126. The court found that by "removing a safe driver from the road and not taking steps to prevent a dangerous driver from taking the wheel, the defendants arguably changed a safe situation into a dangerous one." *Id.* at 1127.

In *Ross v. United States*, 910 F.2d 1422 (7th Cir. 1990), a twelve-year-old boy drown in Lake Michigan during the Waukegan Lakefront Festival. *Id.* at 1424. After the boy fell into the water, his friends ran for help. Two lifeguards, two firefighters, and a police officer responded, as well as two scuba-diving civilians with a boat. Before any rescue attempt could begin, however, the Lake County Deputy Sheriff arrived in a marine patrol boat. The city of Waukegan and Lake County had previously entered into an intergovernmental agreement that required the county to provide all police services in the entities' concurrent jurisdiction on Lake Michigan. Under its authority to police the lake, the county and its sheriff had promulgated a policy that directed all members of the sheriff's department to prevent any civilian from attempting to rescue a person in danger of drowning in the lake. This policy contemplated that only divers from the city of Waukegan Fire Department could carry out such a rescue. With this policy in mind, the Deputy Sheriff ordered all the persons then on the scene to cease their rescue efforts. When the civilian scuba divers stated that they would attempt the rescue at their own risk, the Deputy Sheriff responded that he would arrest them upon their entry into the water and even positioned his boat to prevent their dive. A Waukegan police officer agreed that the Deputy Sheriff had authority over the scene and advised his fellow city employees that they should heed the Deputy Sheriff's instructions. *Id.* at 1424–25. The court found that the county's policy of cutting off private

7

aid to drowning victims led to the deprivation of the child's constitutionally protected right to life. *Id.* at 1431.

Two over-arching themes are apparent in these cases and similar cases falling under this exception. First, the cases involve the state either placing a person in a situation in which he is endangered by other private actors or the state escalates a person's situation from potential danger to actual danger. Second, the state's conduct which places the person in danger or escalates the person's danger is egregious, as to "shock the conscience."

    2.    *Application to This Case*

In this case, the plaintiffs argue that the state-created exception applies because the City of West Bend both created and increased the danger to Swannie. The plaintiffs argue that the Regner Park pond was a man-made pond and that the City created the danger by creating a murky pond with almost zero visibility below the water's surface and unseeable topography across the bottom. (Pls.' Br. at 6.)

Even drawing all reasonable inferences in the light most favorable to the plaintiffs, as I must, the evidence is insufficient for a jury to conclude that the defendants created the danger to Swannie. It is true that the Regner Park pond is a man-made body of water with poor visibility and uneven topography, run by the City of West Bend. Moreover, no one disputes that swimming, whether in a swimming pool, man-made pond, or in a naturally occurring body of water, has inherent risks involved, including the risk of drowning. *See Slade v. Bd. of Sch. Directors of City of Milwaukee*, 702 F.3d 1027, 1032 (7th Cir. 2012) ("It is well known to most adults that lakes and other natural bodies of water, even inland water, are dangerous because of currents and uneven depth, and especially to children."). But the mere fact that the state built a swimming facility, whether a pool or a man-made pond, does

not automatically create constitutional liability. Otherwise, every case involving an injury that occurred in a state-created swimming facility could automatically be brought in federal court. *See Slade v. Bd. of Sch. Directors of the City of Milwaukee*, 871 F. Supp. 2d 829, 833 (E.D. Wis. 2012), *aff'd sub nom. Slade*, 702 F.3d 1027 (quoting *Waybright v. Frederick Cnty., Maryland*, 528 F.3d 199, 208 (4th Cir. 2008) ("The state-created danger theory is not so broad that it mandates a 'federal displacement of state authority over state activities'; otherwise, it would 'potentially set up a federal question whenever an accident happens during activities sponsored by the state.'").

The evidence is also insufficient to show that the defendants increased the danger to Swannie. The plaintiffs argue the defendants increased the danger to Swannie by failing to take proper safety precautions, such as failing to dredge the muck from the bottom of the pond, leaving the bottom of the pond uneven with unexpected drop-offs in an area open to small children, encouraging small children to enter the pond in a designated area that allowed access to a dangerous "deep well," not separating the children's area from the deeper areas, not putting buoys in areas that marked off depth changes, not creating a formal entrance where persons were informed of the safety rules, and not properly training the lifeguards. (Pls.' Br. at 9.) The plaintiffs further argue that the lifeguards increased the danger to Swannie because the lifeguards were responsible for announcing pool rules, yet Swannie's mother was never advised of the rules and the very fact that lifeguards were posted at the pond provided "an aura of safety to small children entering the Murky pond and gave Swannie's mother the false impression that the lifeguards would be watching out for Swannie while in the Murky pond." (Pls.' Br. at 10.) The plaintiffs are also critical of the

9

training given to the lifeguards and the fact that one lifeguard, Abigail Ehmke, testified that she felt "overwhelmed" that day and could not scan her zone properly. (Pls.' Br. at 11–14.)

The plaintiffs argue that Swannie's case is closely akin to the situation in *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979). In *White*, three minor children were riding in an automobile driven by the children's uncle. *Id.* at 382. The uncle was stopped and arrested by police for drag racing. *Id.* Despite the uncle's pleading with the officers to take the children to the police station or to a phone booth so that they could contact their parents, the officers refused to provide any such aid. *Id.* Rather, the officers left the children in an abandoned automobile on the side of the road. *Id.* Under exposure of cold, the children finally realized that they had no alternative but to leave the car, cross eight lanes of traffic, and wander on the freeway at night in search of a telephone. *Id.* The plaintiffs argue that as in *White*, the defendants left Swannie to "navigate the Murky pond in a potentially life-threatening situation that lifeguards were specifically trained to identify and prevent." (Pls.' Br. at 9.)

*White*, however, is not helpful to the plaintiffs' case. In *White*, the court noted that "the police could not avoid knowing that, absent their assistance, the three children would be subjected to exposure to cold weather and danger from traffic." 592 F.2d at 385. The concurring opinion further explained that the children were under the protection of their uncle. *Id.* at 387. Arresting the uncle and providing the children no alternative protection left them exposed to the danger of the high-speed expressway and the cold. *Id*. In this case, Swannie went to the pond in the custody and care of her mother. At no time did the defendants arrest Swannie's mother or any other state actor interfere with her mother's custody. Although the plaintiffs argue that having lifeguards gave Connie Her a false sense of security that the lifeguards would be watching Swannie, at no time was Swannie in the

lifeguards' custody. So unlike in *White*, the defendants never took away Swannie's protector, leaving her to navigate the murky pond.

This case is more like *Slade*. In *Slade*, a seventh-grade student drown while on a school field trip to Mauthe Lake. The plaintiff argued that the defendants were liable based on the state-created danger exception. The plaintiff argued the defendants placed the student in danger by planning and facilitating a trip that allowed swimming in Mauthe Lake. 871 F. Supp. 2d at 832. In dismissing the plaintiff's claims, the court reasoned that the defendants did not require the student to swim and the student could have stayed out of the water without any adverse consequences. *Id.* In other words, the state did not force the student into the water or propel him into danger. *Id.* Similarly, the defendants did not force Swannie into the water. She could have stayed out of the water without adverse consequences.

As the Seventh Circuit stated in *Doe*, the state-created danger exception is narrow, reserved for those rare and egregious cases. 782 F.3d at 917. The plaintiffs argue they need not show the defendants' actions "shock the conscience" at summary judgment, citing the Seventh Circuit's pattern jury instruction 7.21 in support. (Pls.' Br. at 11.) But the comments to pattern jury instruction 7.21 do not state that a plaintiff need not show the defendant's actions "shocks the conscience"; rather, it affirms this requirement. *See* 7.21f ("A state-created-danger claim is a 'substantive' due process claim, and as a result the cases say the plaintiff must establish that the defendant's action 'shocks the conscience.'"). While the Seventh Circuit in *Slade* expressed displeasure with the term "shocks the conscience" as a touchstone of liability because of its tendency to "complexify" the issue, 702 F.3d at 1033, the court did not do away with the element. *See McGinnis v. Muncie Cmty. Sch. Corp.*, No. 11-CV-1125, 2013 WL 2456067, at *8 (S.D. Ind. June 5, 2013) (explaining that while Judge

Posner in *Slade* expressed the court's unhappiness with the use of the terms "affirmative act" and "shocks the conscience" because of the difficulties defining the terms, the court "implicitly recognizes that the 'shocks the conscience' test is just a complicated term for the test he articulates"). Although this is clearly a tragic case, plaintiffs have not shown conduct on the part of the state that is so "clearly deserving of universal reprobation" that it "shocks the conscience." *White*, 592 F.2d at 385–86.

Finally, it is important to note that neither negligence nor gross negligence is sufficient for liability under the Due Process Clause. *See Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991). The plaintiffs do not allege that the City had absolutely no safety measures in place at the pond. There were lifeguards, there were guidelines in place for the lifeguards to follow to ensure patron safety, and the pond was divided into zones with roping to mark the deeper areas. What the plaintiffs argue is that the defendants could have had more safety features in place to make the Regner Park pond a safer swimming facility. Whether the defendants failed to have sufficient safety measures in place is a question of whether the defendants failed to exercise ordinary care under the circumstances. This is a question of negligence, not a due process violation.

For these reasons, the defendants' motion for summary judgment is granted as to the plaintiffs' Fourteenth Amendment claim as to the individual defendants and the claim is dismissed. Because there is no underlying constitutional injury, all claims alleged under *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658 (1978) are also dismissed. *See Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1994) ("[T]o prevail on a *Monell* claim, the plaintiff must establish . . . that he suffered a constitutional injury.").

Without the Fourteenth Amendment claim, all that remains are the plaintiffs' state law claims. I will follow the general rule by relinquishing jurisdiction over the supplemental state law claims. *See Redwood v. Dobson*, 476 F.3d 462, 467 (7th Cir. 2007) ("A court that resolves all federal claims before trial normally should dismiss supplemental claims without prejudice."). Thus, the plaintiffs' state law claims are dismissed without prejudice.

## CONCLUSION

This case is indisputably tragic, and nothing in this decision is intended to minimize the tragedy of the loss of six-year-old Swannie. The Seventh Circuit has found, however, that the state-created danger exception is a narrow one, generally reserved for rare and egregious cases. Even drawing all reasonable inferences in the light most favorable to the plaintiffs, the evidence is insufficient for a jury to conclude that the defendants placed Swannie in danger or transformed her potential danger to actual danger. Thus, the defendants' motion for summary judgment as to the plaintiffs' Fourteenth Amendment claim is granted. I decline to exercise supplemental jurisdiction over the plaintiffs' pendent state law claims.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the defendants' motion for summary judgment (Docket # 36) is **GRANTED**. The plaintiffs' Fourteenth Amendment claim (First Cause of Action of Amended Complaint) is dismissed. Plaintiffs' state law claims (Second, Third, and Fourth Causes of Action of Amended Complaint) are dismissed without prejudice.

**IT IS FURTHER ORDERED** that the defendants' motion to exclude expert testimony (Docket # 42) is **MOOT**.

**IT IS FURTHER ORDERED** that the clerk of court will enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 30th day of October, 2018.

BY THE COURT:

_s/Nancy Joseph_____
NANCY JOSEPH
United States Magistrate Judge